**C.P. PAYNE, Plaintiff,**

v.

**ILLINOIS CENTRAL GULF RAILROAD, Defendant.**

No. 82–2703 H.

United States District Court,
W.D. Tennessee, W.D.

Aug. 4, 1987.

Donald A. Donati, Memphis, Tenn., for plaintiff.

Charles Burr, Memphis, Tenn., for defendant.

### MEMORANDUM AND ORDER GRANTING JUDGMENT TO DEFENDANT AND DISMISSING LAWSUIT

HORTON, Chief Judge.

C.P. Payne filed this lawsuit against Illinois Central Gulf Railroad (ICGR), charging the defendant railroad discriminated against him on the basis of his age and race. Mr. Payne claims the defendant's conduct has violated legal rights guaranteed him under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended, and 42 U.S.C. § 1981 and 29 U.S.C. § 621. (Plaintiff subsequently agreed to dismiss the age discrimination claim.) The jurisdiction of the Court is invoked pursuant to these statutes as well. Mr. Payne asks as remedy for defendant's illegal conduct equitable relief and monetary relief, including compensatory damages, punitive damages, as well as award of attorney fees and costs of this litigation.

Specifically, Mr. Payne charges defendant with the following illegal conduct:

1. ICGR wrongfully denied his Chicago seniority date when plaintiff voluntarily transferred from Chicago to Memphis on April 4, 1979. He claims he was denied the Chicago seniority date on the basis of his race.

2. ICGR wrongfully delayed plaintiff's transfer to Memphis from Chicago. He claims he was not allowed to transfer to Memphis on the first occasion when he was qualified to do so because he was black.

3. ICGR, following his transfer, wrongfully denied him the bid positions of fork lift operator, stockman, and crane operator, as well as extra board work as an extra clerk, all on the basis of his race.

ICGR, however, denies it has violated the civil rights laws of the United States. Instead, defendant charges Mr. Payne has failed to prove by a preponderance of the evidence that he was treated differently from other similarly situated employees because of his race or that its actions were motivated by an intent to discriminate against plaintiff or any other black employee. ICGR specifically contends plaintiff was assigned the correct seniority date under the terms of the collective bargaining agreement, that he was advised of his transfer rights on several occasions prior to his transfer to Memphis. ICGR further claims plaintiff was disqualified from certain bid positions due to his lack of ability and fitness.

The issue for determination by the Court is whether Mr. Payne has shown by a preponderance of the evidence that the Illinois Central Gulf Railroad, its agents and employees, violated his legal rights established by 42 U.S.C. § 1981 and § 2000e *et seq.* After a trial before this Court and after a careful and thorough review of the entire record in this case, the Court concludes that Mr. Payne has failed to show by a preponderance of the evidence that ICGR violated Title VII of the Civil Rights Act of 1964 or 42 U.S.C. § 1981.

The plaintiff, C.P. Payne, a black male, began employment with ICGR in 1951 as a mail handler in Memphis. He served in the military from 1952–1956. He resumed his association with ICGR in Chicago after his discharge from military service. During his Chicago employment with ICGR he worked in several positions, including service briefly as a mail handler, then a caboose supply man until a period of discharge from 1961–1964. He was reemployed as a laborer in the car department. He transferred to the Clerk's craft in 1968 and joined its union (BRAC). Thereafter he held positions as janitor, stockman and crane operator.

In 1976 Mr. Payne became interested in returning to Memphis. He instigated his transfer by contacting BRAC representatives in Chicago who advised him on bidding for positions in the Memphis district.

Mr. Payne, who has no formal education and only a limited ability to read and write, enlisted the help of his father, who lived in Memphis.

In April of 1979 Mr. Payne successfully bid on a position in Memphis allowing his return. At the time of this litigation, he remained employed by the defendant railroad as an Extra Clerk.

The legal theory under which plaintiff attempts to prove his case is one of disparate treatment, i.e., the defendant intentionally treated plaintiff less favorably than other similarly situated employees and thereby discriminated against the plaintiff. In disparate treatment cases, the now familiar guidelines of McDonnell Douglas-Burdine apply. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). These cases clearly delineate the shifting of burdens between the parties. Initially, however, the plaintiff must establish a prima facie case of race discrimination by showing he belongs to a racial minority; he applied for and was qualified for a position for which the employer was seeking applicants; he was rejected despite his qualifications; and subsequently the employer filled the position with another person who was not a member of plaintiff's racial minority. *McDonnell Douglas,* 93 S.Ct. at 1824.

Courts, however, decline to apply these guidelines rigidly, using them instead as a method of evaluating the evidence in disparate treatment cases. See, e.g., *U.S. Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 1481, 75 L.Ed.2d 403 (1983); *Burton v. State of Ohio, Adult Parole Authority,* 798 F.2d 164 (6th Cir.1986); *Beaven v. Com. of Ky.,* 783 F.2d 672 (6th Cir.1986); *Potter v. Goodwill Industries of Cleveland,* 518 F.2d 864 (6th Cir.1975). These cases stand for the provision that a prima facie case may be established on the basis of plaintiff's showing disparate treatment. *Beaven,* 783 F.2d at 675, states the approach thusly:

[T]he prima facie case focuses upon the primary factual inquiries of any disparate treatment case: " '[whether] the defendant intentionally discriminated against the plaintiff,' " and whether the employer treats people less favorably than others because of race, color, religion, sex or national origin. (citations omitted).

This is not to say, however, the plaintiff's burden is onerous. The plaintiff proceeding under a Title VII theory of disparate treatment must demonstrate his prima facie case by a preponderance of the evidence that defendant's actions affected his compensation, terms, conditions or privileges of employment under circumstances inferring unlawful discriminations. *Id.* (citations omitted).

Once a plaintiff establishes his prima facie case, the burden shifts to defendant to produce or articulate some legitimate non-discriminatory reason for defendant's actions. *McDonnell Douglas*, 93 S.Ct. at 1824. The burden of persuasion remains, however, with plaintiff; only the burden of production shifts between the parties. *Burdine*, 97 S.Ct. at 1843. Therefore defendant is not required to prove absence of discriminatory motive. *Burton*, 798 F.2d at 166 (following *Board of Trustees v. Sweeney*, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978)).

Where both parties in Title VII cases meet their initial burdens of production, the case is then left to be decided on the issue of pretext, that is whether plaintiff can show the reason offered by defendant is merely a pretext for discrimination. *Id.* (citations omitted). Thus, while the burden of production shifts between the parties, the burden of persuasion remains at all times with the plaintiff. *Jackson v. Pepsi Cola Bottling Co.*, 783 F.2d 50, 54 (6th Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 3298, 92 L.Ed.2d 712 (1986) (relying on *Burdine*, 101 S.Ct. at 1093)).

Plaintiff claims also that defendants' conduct is in violation of 42 U.S.C. § 1981 as well as Title VII. Both statutes afford remedy to litigants who have been racially discriminated against in employment and are coextensive and coterminus. *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 459–460, 95 S.Ct. 1716, 1719–1720, 44 L.Ed.2d 295 (1975). Principles governing the evidentiary burdens in Title VII apply equally to actions brought under 42 U.S.C. § 1981. *Long v. Ford Motor Co.*, 496 F.2d 500 (6th Cir.1974).

*Transfer to Memphis*

### A. *Seniority Date*

The alleged discriminatory actions against the plaintiff began in 1975 or 1976 when Mr. Payne set in motion his plans to return to Memphis. He initiated the process by approaching his BRAC representatives in Chicago. He explained to them his desire and reasons for the transfer. Because he had only a limited ability to read or write, Mr. Payne solicited the aid of his father, who accompanied his son and took part in these discussions. Eventually, on April 4, 1979, Mr. Payne, after bidding on some sixty positions, was most senior bidder on the position in Memphis of caboose cleaner permitting his return to Memphis. His seniority date in Memphis was April 4, 1979.

Mr. Payne testified that he believed he could transfer across a seniority district by bidding on a job. It was his understanding, he stated, that if he transferred from Chicago to Memphis as high bidder on a job he would take his Chicago seniority with him. He stated he formed this belief from discussions with officials of the union and of ICGR and his father. He testified he would not have come to Memphis without his Chicago seniority. Mr. Payne stated that he talked with Mr. Russell Gray, general chairman of BRAC, prior to his return to Memphis and Mr. Gray did not inform him he would transfer without it. Mr. Payne further stated he did not learn until the summer of 1981 that he did not have his Chicago seniority in Memphis. The occasion arose when he was "bumped" off his position by an employee with less seniority. Mr. Payne questioned Mr. Leland Dye, manager of the clerks craft, after he lost his position. Mr. Dye informed plaintiff that he was bumped because he had lost his Chicago seniority date when he

transferred to Memphis. Mr. Payne testified this was the time he first knew his Chicago seniority date did not transfer to Memphis. Plaintiff filed a protest through BRAC to protest his lost seniority. BRAC officials notified him a few days later that his correct seniority date in Memphis was April 4, 1979.

Defendants, on the other hand, contend that Mr. Payne, prior to the time of his transfer from Memphis to Chicago in April of 1979, had knowledge of facts from which it should have been apparent that his Chicago seniority date would not transfer with him to Memphis. When Mr. Payne first approached BRAC representatives in Chicago, he was advised of this fact. Officials told him he had two options. He could resign from his job position in Chicago and start over as an extra clerk in Memphis and lose all his seniority rights. Alternatively, he could begin submitting bids for Clerk's craft positions when they were posted in Memphis and be assigned a new separate seniority date on the Memphis roster effective his first payday in Memphis. If he accepted the latter option, he would keep his Chicago seniority in Chicago and would continue accruing seniority in Chicago. Officials advised Mr. Payne's father that Rule 19(c) of the collective bargaining agreement would control his transfer. This provision was explained to both men, and the elder Mr. Payne was given later, but prior to his son's transfer, a copy of Rule 19(c) by ICGR officials in Memphis.

In regard to this issue, the Court after hearing the testimony of the witnesses and having seen the pertinent proof in the record adopts the following findings of fact submitted by the defendant: (12, 13, 14, 16)

12. At some point between 1976 and 1978, Payne became interested in transferring to ICGR's facility in Memphis. (Tr. 35). Payne wanted to transfer to Memphis for personal health reasons. (Tr. 32). When Payne contacted his BRAC representatives in Chicago, he was advised that he should begin submitting bids for Clerk's job positions when they were posted in Memphis. (Tr. 33). Payne also was advised by his BRAC representatives and by ICGRR officials that, alternatively, he could resign from his job position in Chicago and start over as an Extra Clerk in Memphis. (Exhibit 4; Tr. 33–34, 313–14).

13. In early 1978, Payne met in Chicago with R.E. Gray (hereinafter "Gray"), BRAC's General Chairman, and J.L. Browning (hereinafter "Browning"), then Assistant to the General Chairman, to discuss his possible transfer to Memphis. (Tr. 312–13). In the following months, Payne had a total of 7 or 8 meetings with Gray and/or Browning. (Tr. 313–18).

14. After learning of Payne's desire to transfer to Memphis, Browning contacted L.S. Graves (hereinafter "Graves"), ICGR's Manager of Labor Relations, and L.N. Dye (hereinafter "Dye"), ICGR's Director of Industry Services in Memphis.

16. Prior to his transfer to Memphis, Payne met personally with Dye to discuss his transfer to Memphis. (Tr. 35). Dye asked Payne what type of work he was doing in Chicago. Payne told Dye that he did "strictly laborer" work in Chicago. (Tr. 36). On another occasion Payne's father also told Dye that Payne did "strictly labor" jobs in Chicago. (Tr. 534).

Plaintiff claimed that his transfer and retention of seniority rights was governed by the Seniority Modification Agreement rather than Rule 19(c) of the collective bargaining agreement.

The Seniority Modification Agreement (SMA) refers to an agreement entered into November 6, 1975, between BRAC and certain rail carriers, including ICGR. Its primary purpose was to consolidate the then segregated Clerk's seniority rosters. It had limited application to ICGR's clerks because ICGR had consolidated its Clerk's rosters in 1972. The SMA also included a provision allowing clerks for a limited period of time to use their new seniority dates to transfer to certain job positions outside the Clerk's craft, but subject to certain specific geographic locations. The Court adopts the following factual findings made by defendant which explain the SMA:

7. On April 1, 1976, the National Railway Labor Conference (hereinafter "NLRC") notified its member carriers, including ICGR, of the procedures by which the carriers should notify the affected Clerks of their rights under the Seniority Modification Agreement. (Exhibit 28; Tr. 488–89). The NLRC provided each member carrier with a sample packet of materials that included an "Explanation of Rights of Minority and Female Employees Under Seniority Modification Agreements" and a sample cover letter for distribution to each affected Clerk.

8. On April 20, 1976, ICGR distributed a packet of materials to each of its Clerks who was affected by the Seniority Modification Agreement. (Exhibit 29; Tr. 489–90). Each packet contained a cover letter, an "Explanation of Rights of Minority and Female Employees Under Seniority Modification Agreements" and a transfer application form, all of which were identical to the sample forms suggested by the NRLC. (Tr. 490–91).

9. On April 27, 1976, Payne signed a form acknowledging his receipt of the "Explanation of Rights of Minority and Female Employees Under Seniority Modification Agreements" and a transfer application form. (Exhibit 6). At trial, Payne admitted the authenticity of his signature on the receipt. (Tr. 98).

10. Payne never submitted an application to ICGR to transfer under the provisions of the Seniority Modification Agreement. (Tr. 491–92).

11. Payne's transfer from Chicago to Memphis was not carried out under the provisions of the Seniority Modifications Agreement. (Tr. 336). The Seniority, Modification Agreement was inapplicable to Payne's Transfer to Memphis for at least two separate reasons. First, Payne's transfer was between two job positions within the Clerk's craft (Tr. 335–36, 492–93). Second, Payne's transfer from Chicago to Memphis was outside the geographic limits specified in the Seniority Modification Agreement. (Tr. 494). Therefore, Payne could not have retained his Chicago seniority, following his transfer to Memphis, pursuant to the Seniority Modification Agreement.

The testimony shows Rule 19 of the collective bargaining agreement, which governs transfers, was in effect at the time of plaintiff's transfer from Chicago to Memphis. Rule 19 follows:

TRANSFERRING

(a) Employees assigned to positions that are transferred from one city or town to another, or from one seniority district to another, may, if they so elect, transfer with their positions or work. Should an employee elect not to transfer with his position or work, he shall be entitled to exercise his displacement rights.

(b) When an employee elects to transfer with his position or work from one seniority district to another, his seniority shall be dovetailed into the roster to which transferred and his name shall be retained on the roster from which he transfers for a period of five years from date of transfer. During the five year period such employee will have the right to bid for or to exercise acquired displacement rights on positions located in the district from which transferred. An employee returning to his former district shall have his name removed from the roster on which his seniority was dovetailed.

(c) Employees voluntarily transferring without their positions from one seniority district to another in accordance with Rule 8(f) or to accept appointment to a "B-1", "P", or "C" position on another seniority district shall acquire seniority on district to which transferred as of date pay starts in such district and shall retain and continue to accumulate seniority on district from which transferred. If the employees voluntarily leave the seniority district to which transferred when their seniority will permit them to hold a position in that district, they will forfeit seniority on that seniority district. If the employees leave the seniority district to which transferred due to their seniority not permitting them to hold a position on such district, they must re-

turn to that district as soon as their seniority will permit or forfeit seniority in that district. See Exhibit 14.

■ The Court concludes the Seniority Modification Agreement did not apply to Mr. Payne's transfer from Chicago to Memphis. Even if the SMA had permitted plaintiff to make the transfer with his Chicago seniority, Mr. Payne waived his right to do so by failing to make application for SMA benefits.

Testimony was unrefuted that Chicago and Memphis are not in the same seniority district. Consequently, plaintiff's transfer was controlled by the provisions of the collective bargaining agreement, specifically Rule 19(c).

The Court concludes these facts show Mr. Payne either knew or should have known he would not be able to use his Chicago seniority date in Memphis prior to this transfer to Memphis.

The Court concludes as well that, even if plaintiff was unaware of these facts prior to his transfer to Memphis, he admitted he knew about seniority rosters posted annually. He testified as follows (Tr. 90–91):

Q. Okay. Mr. Payne, your seniority date is a very important matter to you, isn't it?

A. Yes, ma'am.

Q. And it has always been an important matter to all railroad employees, isn't that right?

A. Yes, ma'am, I imagine it is.

Q. Because if you have got a lot of seniority, you can basically get whatever job you are qualified for, right?

A. Yes, always have.

Q. How do railroad employees generally find out about their seniority dates, is it from their seniority roster?

A. Yeah, it is from the seniority roster.

Q. And that roster is a list of everyone's name and their seniority date, right?

A. Yes.

Q. And that is put out every year, posted every January?

A. Yeah. Well, I don't know when it is posted because I hardly ever watch the seniority roster no way.

Q. But you have been working for the railroad a lot of years and you know there is a seniority roster coming up ever every year, is that right?

A. Yeah, they have a seniority roster, right.

Mr. Payne's name appeared on the Clerk's seniority roster in Memphis on January 1, 1980. His seniority date was listed as April 4, 1979. (See Exhibit 5; Tr. 322–323). He stated during examination by counsel for the defendant that he could identify his name and seniority date typed on a roster.

Mr. Payne had the knowledge and means of learning his seniority date by no later than January 1, 1980.

In an effort to show he was denied seniority for racial reasons, plaintiff attempts to show certain white employees were allowed either to transfer with their seniority dates or to have their seniority dates adjusted by ICGR. These white employees— J.M. Clay, O.M. Bird and James Wade— plaintiff claims were given substantial adjustments in seniority in spite of the fact each never filed a protest, grievance or lawsuit and seniority rosters had been posted for years. The basis for this claim was introduced by plaintiff's witness, Ms. Alfreda Young, an ICGR employee since October 1976. Ms. Young served as secretary to the local BRAC and at one time maintained ICGR personnel files. During her testimony she identified the 1977 roster as showing J.M. Clay and O.M. Bird with seniority dates of November 1, 1974. The 1978 roster indicated a December 16, 1944 seniority date for Clay and a September 1, 1966 date for Bird. Ms. Young testified she had no personal knowledge of circumstances under which adjustments for these employees were made. Plaintiff claimed three white employees—J.G. Walker, K.B. Cooper, R.O. Ray—wrongfully received additional seniority on the Memphis Clerk's roster.

Defendant's findings of fact number 27–31 correctly describe the facts related to

this allegation and are adopted by the Court:

27. In January, 1982, after Payne had been "rolled" onto the "extra board," he complained to Browning concerning the adjustment of the seniority dates of two white Clerks who were then employed by ICGRR in Memphis, J.M. Clay (hereinafter "Clay") and O.M. Bird (hereinafter "Bird"). [Exhibit 17; Tr. 63–64, 328–29]. Browning conducted an investigation of Payne's complaint and sought an explanation from BRAC's General Chairman regarding the adjustment of the seniority dates of the two employees. [Exhibit 17, p. 2; Tr. 329–30]. In a letter to Payne dated March 7, 1982, Browning explained the reason why the seniority dates of the two employees had been adjusted. [Exhibit 17, p. 3].

28. The adjustments of the seniority dates of Clay and Bird were carried out under circumstances substantially different from the circumstances of Payne's transfer from Chicago to Memphis. [Tr. 333–34]. Both Clay and Bird were employed as stenographers in "P" (or "partially covered") job positions within the Clerk's craft. [Exhibits 40, 41; Tr. 331, 390]. In 1974, a national agreement was reached between BRAC and various rail carriers, including ICGRR, that all "P" position Clerks would be assigned an arbitrary seniority date of November 1, 1974, regardless of the dates when they actually began working on jobs in the Clerk's craft. [Tr. 276–77, 331–333, 494–95]. Subsequently, in 1978, a superceding agreement was reached between BRAC and the carriers by which the seniority date of each "P" position Clerk was adjusted to the first day when he or she began working on a "P" position in the seniority district where such beginning work occurred. [Exhibit 31; Tr. 332, 393–94, 495]. As a result of the 1978 agreement, Clay's seniority date on the Memphis Clerk's roster was adjusted to December 16, 1944, which is the first day when she worked on a "P" position in Memphis. [Exhibits 20, 41; Tr. 277, 495] Bird's seniority date on the Memphis Clerk's roster was adjusted to September 1, 1966, which was the first day when she worked on a "P" position in Memphis. [Exhibits 20, 40; Tr.

277]. Unlike Payne, neither Clay nor Bird ever worked for ICGRR in any seniority district outside Memphis. [Tr. 332–34, 392, 530]. Therefore, neither Clay nor Bird was similarly-situated to Payne.

29. At trial, Payne also alleged that a white Clerk, J.G. Walker (hereinafter "Walker"), received "additional seniority" on the Memphis Clerk's roster. [Tr. 64]. Payne admitted that he had no personal knowledge regarding Walker's seniority date. [Tr. 64]. In fact, the circumstances involving the adjustment of Walker's seniority date were substantially different from those involving Payne. Walker began working for ICGRR in Memphis on November 16, 1964 in the Traffic Department [Exhibits 39, p. 5, 42; Tr. 368]. She acquired her so-called "additional seniority" on the Memphis Clerk's roster when the roster for the Traffic Department, which was headquartered in Chicago, was consolidated in 1972 with the Memphis Clerk's roster. [Ex. 42 p. 2; Tr. 368, 395–96, 531]. Unlike Payne, Walker was never employed by ICGRR outside the Memphis seniority district. [Tr. 368, 531]. She did not transfer from one seniority district to another under Rule 19(c) of the collective bargaining agreement, as Payne did in 1979. [Tr. 396, 531]. Therefore, Walker was not similarly-situated to Payne.

30. At trial, Payne also suggested through his counsel's cross-examination of Browning that two other white Clerks, R.O. Ray, Jr. (hereinafter "Ray") and K.B. Cooper (hereinafter "Cooper"), received "additional seniority" on the Memphis Clerk's roster following their transfers to Memphis. [Tr. 399–401]. In fact, the adjustment of the seniority dates of Ray and Cooper involved circumstances that were substantially different from those involving Payne. Neither Ray nor Cooper ever held a seniority date on any Clerk's roster other than in Memphis. [Exhibits 5, 12, 39; Tr. 401, 531–33]. Ray, a permanent employee in Memphis, was assigned temporarily to New Orleans on an appointed position as secretary to the Division Superintendent, but during the temporary assignment he continued to hold his seniority date on the

Memphis Clerk's roster. [Tr. 401, 532]. Cooper, also a permanent employee in Memphis, was assigned temporarily to Chicago on an "excepted" secretarial job, but during the temporary assignment he continued to hold his seniority on the Memphis Clerk's roster. [Tr. 533]. Neither Ray nor Cooper transferred to or from Memphis under Rule 19(c) of the collective bargaining agreement, as Payne did in 1979. Therefore, neither Ray nor Cooper was similarly-situated to Payne.

31. On February 18, 1982, Payne filed E.E.O.C. Charge of Discrimination No. 043–82–0369 against BRAC, alleging that BRAC had adjusted the seniority dates of Clay and Bird, but that it refused to adjust his seniority date following his transfer from Chicago to Memphis. The charge did not mention Walker, Ray or Cooper.

J.L. Browning, the local chairman of BRAC and a thirty-three year employee of ICGR, stated he had personal knowledge of these adjustments and testified that these adjustments were made in circumstances and for reasons dissimilar to Payne's circumstances. This testimony is reflected in facts numbered 27–29, *infra*.

Of significance to the Court is the fact that these employees were not transferred from seniority districts outside Memphis. Further, the unrefuted proof is that the directive to adjust the seniority of "P" position employees came from national headquarters in Chicago (BRAC) pursuant to an agreement between the railroad's personnel department in Chicago and the Union in Chicago. Plaintiff fails to establish that his voluntary transfer from outside the Memphis seniority district is similar to the circumstances of these employees. Plaintiff produced no evidence these employees were transferred from seniority districts outside Memphis. Plaintiff failed to produce any evidence of discriminatory intent in these seniority adjustments.

■ Based upon the applicable law, plaintiff fails to state facts that demonstrate these employees were similarly situated to plaintiff within the meaning of Title VII disparate treatment cases. See *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir.1984); *Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63, 68 (6th Cir.1985). Testimony in the present case shows these employees were not similarly situated in their ICGR positions, basis for their transfers, or the basis for the transfers pursuant to the collective bargaining agreement. Therefore, no racially discriminatory intent can be inferred.

■ It is ICGR's position that Mr. Payne's seniority claim is time-barred, thereby rendering the Court without jurisdiction to hear this portion of plaintiff's claim. The Court has concluded Mr. Payne either knew or should have known in April of 1979 that he could not transfer his Chicago seniority to the Memphis roster. For Title VII purposes, this commenced the running of the charge filing period. See *McWilliams v. Escambia County School Bd.*, 658 F.2d 326 (5th Cir.1981); *Wolfolk v. Rivera*, 729 F.2d 1114 (7th Cir.1984). Mr. Payne did not file his charge with EEOC until February 18, 1982, thereby failing to meet statutorily mandated jurisdictional prerequisites. 42 U.S.C. § 2000e–5(e); *Alexander v. Gardner-Denver Co.* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974); *Geromette v. General Motors Corp.* 609 F.2d 1200 (6th Cir.1979), reh. denied, 448 U.S. 912, 101 S.Ct. 29, 65 L.Ed.2d 1174 (1980). Defendant further contends plaintiff's § 1981 claim is time-barred as well. See *Johnson v. Railway Express Agency*, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975) (one year limitations period pursuant to Tenn. Code Ann. 28–304).

Plaintiff, on the other hand, claims the limitations period was tolled because the alleged discriminatory action was a continuing violation, relying on *Held v. Gulf Oil Co.*, 684 F.2d 427 (6th Cir.1982) and *Roberts v. North American Rockwell Co.*, 650 F.2d 823 (6th Cir.1981).

The Court finds that plaintiff's new seniority date on the Memphis ICGR roster does not constitute a "continuing violation" as contemplated by the *Roberts* and *Held* opinions. See, e.g., *Equal Employment, Etc. v. McCall Printing Corp.*, 633 F.2d 1232, 1237 (6th Cir.1980) (citations omitted).

Thus, this Court lacks the power to adjudicate this issue.

Assuming, however, the Court had jurisdiction to adjudicate this issue, the Court concludes that plaintiff's new Memphis seniority date was determined by Rule 19(c) of the collective bargaining agreement and was not, as plaintiff claims, racially motivated. The Court finds plaintiff has failed to show by a preponderance of the evidence proof of the specific discriminatory intent that is required in order to establish liability on the seniority issue. See *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

### B. *Delay in Transfer*

Plaintiff also attempted to demonstrate racial discrimination with the claim the defendant did not award him the first available Memphis position for which he was the qualified senior bidder. The basis for this charge was also presented through the testimony of Ms. Young. Ms. Young stated that stockmen and other laborer positions were posted in 1977 and 1978 on which no bids were received from incumbent Memphis employees, and that ICGR [rather than award plaintiff's bid] hired new employees off the street to fill the positions. Analysis of her testimony shows, however, Ms. Young did not identify any such employee by name or race.

Mr. Payne through an attorney complained to BRAC officials in August 1981 regarding this claim. Mr. Browning investigated the matter and determined that extra clerks were in fact hired during the period in question. All these individuals, however, had been required to pass a written clerical test and were expected to perform some typing, filing and billing and other skilled clerk's tasks—tasks plaintiff was not qualified to do. Further, the testimony was that these newly hired individuals were hired directly into positions which Mr. Payne could not have filled.

Plaintiff attempted to discredit Mr. Browning's investigation of this matter by eliciting from him testimony that he had relied on ICGR's records, e.g., payroll records, for his investigation. The plaintiff, however, introduced records showing that in fact the individuals were required to take and pass clerical tests and that Mr. Browning did have personal knowledge of the circumstances regarding the administration and use of these tests. The following findings of fact submitted by the defendant are therefore adopted by the Court:

24. Each of the new Extra Clerks who were hired by ICGRR between 1976 and 1979 were required to pass a written clerical test. [Exhibits 15, 16; Tr. 327, 415–17, 523–29]. All of the new Extra Clerks were qualified to do typing, billing and other skilled Clerk's tasks. [Tr. 327, 526–27]. Therefore, none of the new Extra Clerks was similarly-situated to Payne. None of the newly-hired Extra Clerks was hired directly into a laborer position that could have been filled by Payne [Exhibits 15, 16; Tr. 324–28, 412, 415–17, 523–29], although some of them subsequently bid for and filled Stockman and Lift Truck Operator positions in the Materials Department when no skilled Clerk positions were available. [Tr. 327, 412–16].

25. Payne made specific reference at trial to three white Extra Clerks who were hired by ICGRR between 1976 and 1977, Otis H. Jones, Jr. (hereinafter "Jones"), Bruce D. Maestri (hereinafter "Maestri") and Shelby L. Knight, Jr. (hereinafter "Knight"). ICGRR's records reflect that Jones took and passed ICGRR's clerical test on January 29, 1976. [Exhibit 35]. Jones began employment with ICGRR as an Extra Clerk on April 25, 1977. [Exhibit 38, p. 8; Tr. 523–25]. Maestri took and passed ICGRR's clerical test on January 27, 1977. [Exhibit 36]. Maestri began employment with ICGRR as an Extra Clerk on February 19, 1977. [Exhibit 38, p. 7; Tr. 523–25]. Knight took and passed ICGRR's clerical test on July 20, 1977. [Exhibit 37]. Knight began employment with ICGRR as an Extra clerk on July 26, 1977. [Exhibit 38, p. 8; Tr. 523–25].

26. During the period between 1977–78, when Payne was attempting to transfer from Chicago to Memphis, ICGRR hired a

total of 33 new Extra Clerks, 15 of whom were black. Each of the new Extra Clerks took and passed a clerical test. [Exhibit 39; Tr. 282, 528–29].

Defendant's testimony showed the Extra Clerks in question were able to read and write and were qualified to perform clerical tasks and were initially hired to perform clerical tasks at ICGR. These employees were not similarly situated to plaintiff for purposes of Title VII and therefore no discriminatory intent can be inferred based on these facts and the applicable law. See *Nix v. WLCY Radio/Rahall Communication* and *Murray v. Thistledown Racing Club, Inc., supra.*

Mr. Payne complains also that he was denied positions for which he was qualified at defendant railroad due to racial discrimination. Specifically, he contends he applied for and was denied permanent positions as stockman, lift truck operator and crane operator. He claims he was denied each position due to the intentional discrimination of William "Billy" Rutherford, the general foreman in ICGR's materials department. Plaintiff claims Mr. Rutherford was responsible for the decision to disqualify him on each of these positions and that racial bias was his motive. (See Plaintiff's Reply Brief, page 14). He also claims Rutherford kept him from receiving "extra clerk" work as well.

It is helpful at this point to note ICGR's personnel policies regarding temporary assignments, or working "off the extra board" as background to Mr. Payne's claims. The extra board refers to the method used by the railroad for supplying temporary replacements to fill a permanent job position. Extra clerks, i.e., those employees who do not hold permanent positions, are assigned to work temporarily, or fill in, for regular permanent employees who are absent due to illness, vacations, or other reasons. Extra clerks consist of both white and black employees. They are assigned to the "extra board." They are called to fill temporary assignments by ICGR in order of their seniority dates. Sometimes an extra clerk is called off the extra board to work in a position for which

he is not qualified. In this regard, the Court adopts defendant's conclusions of fact numbered 42, 43, and 45:

42. The assignment of jobs to Extra Clerks who are working off of the "extra board" at Johnston Yard is the responsibility of the Chief Clerk. Extra Clerks are assigned on a temporary basis to fill job positions (such as Stockman, Lift Truck Operator and Crane Operator) of Clerks who are absent for reasons such as sickness or vacation. [Tr. 225–26, 240–44, 537–38, 603]. The Chief Clerk maintains a list of all Extra Clerks who have been designated as qualified to fill each Clerk's job position. [Tr. 227, 287–88, 538]. The determination of which Extra Clerks are qualified to fill a particular Clerk position is made by the supervisor of each department in which Clerks work, based on his observation of the demonstrated job skills of the Extra Clerks. [Tr. 227, 240–42, 244, 451]. At the beginning of each work day, if a Clerk position is vacant, the Chief Clerk calls the most senior Extra Clerk who is qualified to fill that position. If the most senior qualified Extra Clerk is unable to fill the job position for some reason, the Chief Clerk calls the next most senior qualified Extra Clerk. If the Chief Clerk is not able to fill the position after calling all of the Extra Clerks who are qualified, he then calls the most senior Extra Clerk who is not qualified for the position. [Tr. 234–35, 538, 603–04]. The practice of allowing an unqualified Extra Clerk to fill a job position is commonly referred to as "sitting" on a job. [Tr. 234, 471–72, 538]. The purpose of allowing an unqualified Extra Clerk to "sit" on a job is to provide some minimal benefit to the railroad (which is required under the collective bargaining agreement to pay the standard daily wage regardless of whether the job position is filled) and to provide the opportunity for the unqualified Extra Clerk to observe the operation of the department. [Tr. 235, 471–72, 478].

43. When an unqualified Extra Clerk "sits" on a job, it is the prerogative of the supervisor in the department to have the Extra Clerk perform any laborer tasks that need to be done [Tr. 163, 472, 538], but the Extra Clerk still receives the daily rate of

pay of the Clerk who holds the job position on a permanent basis. [Tr. 164, 184–85, 216, 472, 538–39]. It is a common practice for both black and white unqualified Extra Clerks to be assigned laborer tasks such as sweeping the floor and cutting grass. [Tr. 202–03, 472, 538, 604, 713, 757–58, 769, 770–71, 777–78].

45. The practice of requiring unqualified Extra Clerks who are "sitting" on a job position to perform various laborer tasks has been applied uniformly to all Extra Clerks, both black and white. [Tr. 202–03, 472, 538, 604, 704, 713, 724, 757–58, 769–71, 777–78]. Because the laborer tasks often involve work that is strenuous and dirty, the practice is a source of frequent complaints by all Extra Clerks, both black and white. [Tr. 733].

Plaintiff concentrated a great deal of testimony on Rutherford's alleged practice of assigning the most menial tasks only to blacks, especially Mr. Payne. These tasks, such as cutting the grass and high weeds, sweeping floors, were characterized as cruel and demeaning. Plaintiff attempted to show through testimony that white employees were never required to perform these tasks. However, evidence, including the testimony of the plaintiff's witness T.L. Jones and ICGR's witnesses (Robert Maddox, Dale Maestri, James Wade), is clearly contrary to this charge. Black employees and white employees testified that Rutherford required everyone to perform these tasks when other tasks were completed.

Testimony from various witnesses indicated that in the materials department unqualified extra clerks, both black and white, who were assigned to "sit" temporarily on a job position, might be required to perform laborer duties. Extra clerks, black and white, it appears from the evidence, complained of this practice. However, by permitting an unqualified employee to sit on a job, the railroad derives some minimal benefit since it is required by the collective bargaining agreement to pay the standard daily wage whether or not the position is filled. The unqualified employee is provided the opportunity to observe the operation of the department.

The Court adopts the following conclusions of fact from defendant's brief:

56. It is a common practice in the Materials Department for all Extra Clerks, both black and white, to be instructed from time to time to perform laborer tasks rather than the regular job duties of the position that they were called to fill on a temporary basis. One of Payne's own witnesses, J. Jones, a black, testified that all employees were required to perform laborer tasks such as grass cutting. [Tr. 202]. Maestri, a white Extra Clerk, testified that he had been called off of the "extra board" on many occasions as an unqualified Extra Clerk to "sit" on the Crane Operator's position in the Materials Department. [Tr. 769]. On those occasions, Rutherford instructed Maestri to perform laborer tasks such as cutting grass with a swing blade, loading and unloading box cars and spraying creosote on weeds. [Tr. 769]. Maestri testified that this was a common practice for both black and white Extra Clerks. [Tr. 770–71]. Payne's testimony also was contradicted by James Wade (hereinafter "Wade"), another white Extra Clerk. Wade testified that when he worked in the Materials Department, he always held a permanent job position. [Tr. 776]. Despite his permanent job position, Rutherford instructed him to perform various laborer tasks such as unloading trucks and box cars, cutting grass with a swing blade and "Weed Eater", and spraying creosote on weeds. [Tr. 777–78]. Maddox, a black, testified that he has seen white employees doing manual labor in the Materials Department such as cutting grass and sweeping floors. [Tr. 758]. Therefore, Payne has failed to prove that he was assigned to manual labor tasks in a racially discriminatory manner.

Plaintiff also complains that Rutherford's manner of dealing with black employees was racially motivated. Plaintiff introduced testimony of James L. Jones and Johnny Rainey, ICGR employees who filed formal grievances against Mr. Rutherford, to demonstrate his racial prejudice.

Mr. James L. Jones, a twenty-two year employee of ICGR, was supervised by Mr.

Rutherford for fifteen years. He testified that it seemed to him he could not satisfy Rutherford in his work, that Rutherford appeared to rush Jones. Rutherford told him that "if I didn't do better or something, I needed to quit. Things like that." (Tr. 197).

Mr. Jones complained to his BRAC representative and eventually filed a complaint which stated in part:

1. Mr. Rutherford constantly picks on him and harasses him, almost on a daily basis.

2. He constantly comes up to me and tells me that I need to resign. also, he tells me that I don't do my work to satisfy him—that I am not fast enough. This means it is nothing that I can do to satisfy him on an employee working levelability. Thus, he uses me for an example of cracking jokes. I can be sitting up along with the other white fellows and he singles me out concerning my work/job. All of this is nothing but pure harassment.

3. I cannot go to the washroom, when it is really needed, unless he follows me, and when I go to the bathroom, he comes in there and tells me how many times I can to go the restroom.

4. Everyone who works in this department is aware of what Mr. Rutherford is doing.

5. Thence, the white guys can be sitting and talking about fishing, for example, and he gets involved; whereas, if I am talking about the same thing, he will inform me that I am not on my job or doing my job, which singles me out from being comfortable, and having all of these conveniences that the white guys enjoy. This, in its smallest degree, is discrimination; and, I am sure, not only would the NAACP, CORE, COBY, EEOC not tolerate such acts of injustice, but laws of this nation would allow a citizen certain privileges—not judging by the color of his skin.

7. In addition, he punishes me through unnecessary work for not reason in the world. He has the black guys protecting the white guys when the whites are mak-ing the money. In other words, he has the blacks doing the hardest or more strenuous work; or even if there is something to be done and a black is around and a white is around, the black does it—not the whites and blacks together. (Exhibit 53).

In response to this complaint, Rutherford apologized to Jones, an apology accepted by Jones and which ended the friction between the two.

Rutherford testified that he did keep close track of Jones and other employees:

Q. Now, have you ever told your employees something to the effect that, if you don't want to work, go home?

A. Yes, sir, yes, sir.

Q. Have you done that seldomly or have you done that frequently?

A. Frequently, any time that they didn't want to do the tasks that they were assigned, both black and white that didn't want to do the job that they were assigned to, yes, sir, go home if you don't want to work.

Q. Okay. Have you ever followed your employees around on a cart and checked up on them every ten or fifteen minutes to make sure they are doing their job?

A. Yes, sir, I could have, yes, sir.

Q. All right. What sort of circumstances would that arise in?

A. Well, that was my duty to see that the men did their job, riding around and, you know, ever so often to see that the job was being done.

He stated he did on occasion follow Jones to the rest room. He testified during cross examination as follows:

Q. Do you see that?

A. No, not yet.

Q. In the middle of the second paragraph?

A. He says, "The fact that Mr. Rutherford constantly picks on me at times, which I am sure, also, my fellow co-workers can and will vouch for ..."

But I didn't pick on Mr. Jones. Mr. Jones was, I thought was not—well, he would go to the rest room and stay just—he would go to the rest room just

numerous times during the day and stay long lengths of time, and, the—where the biggest majority, the thing that he was complaining to me about was the crane making noise and that I wasn't doing anything about it. What I did, I went on the crane, I went and—

Q. Well, Mr. Rutherford let me stop you there and ask you about the question that I asked.

A. Okay.

Q. In the letter that you saw, Mr. Jones, he complains about you engaging in racial discrimination?

A. But I didn't.

Q. But he complains about it?

A. Okay.

Q. Doesn't he?

A. Yes, sir, he did here, yes, sir.

Q. Didn't he complain to you of racial discrimination?

A. To my face, no, sir, no, sir.

Q. What about in the meeting that you had with him, did you have a meeting with him, as a result of this, later?

A. Yes, sir, we had a meeting. No, sir, not as a result of the letter. He had—I didn't know about the letter at the time, I seen the letter since. We had a meeting in Mr. Jendras' office and we talked, we ironed out our differences. I apologized to Lionel Jones and after that Lionel Jones and I was good friends.

Q. He comments in the letter about you following him into the bathroom, doesn't he?

A. Said—yes, sir.

Q. "I cannot go to the washroom, on occasions when it is really needed, unless he follows me. I might add here, I'm no "slave." He has a bad impression or he impresses, or he is trying to impress or imply as if I can't do my work, when all of the time, I know that I can do my job effectively."

A. That is not the way it was. He was going to the rest room, and he would stay in the rest room long lengths of time, and I would have to go to the rest room and get him out and get him back on the job.

Q. But he complained to you at that time about that, that you were following him around?

A. No, sir, he complained about—yes, sir, he would—when he was on the lift truck there and was having a little trouble there on the lift truck, he was complaining, he would run the lift truck just as slow as the lift truck would run, and I would have some work maybe to be done, you know, and, Lionel, pick it up and work a little faster for me. And he complained about me riding him.

Q. Have you ever been fishing with any of the employees in the storeroom?

A. No, sir.

Q. You ever sit around talking to people in the storeroom about fishing?

A. Yes, sir, blacks and whites.

Q. Did Mr. Jones complain that the white employees were allowed to sit around talking about fishing while you singled him out to work?

A. No, sir, I seen that in the letter but, no, sir.

Q. He never mentioned that to you?

A. No, sir.

Q. Never mentioned it in the meeting with you?

A. No, sir.

Q. What about complaining that blacks were given the more strenuous, the hardest work to do?

A. No, sir, I seen that in the letter.

Q. Never complained to you about it?

A. No, sir, both white and black complained a lot of times about doing some of the work that we had to do that they didn't like, but it's work that had to be done.

Q. Well, you knew back in 1979, when this letter was written, you knew from Mr. Jendras that these complaints had been made against you?

A. No,—Mr. Jendras, yes, sir, talked to me about, but didn't know about the letter?

Q. You didn't know about the letter?

A. No, sir.

**1322**

Q. What about the grievance that Mr. Browning filed about the way you treated Mr. Jones?

A. Didn't know anything about it until later.

Q. How later?

A. I don't know, sir.

Q. Did you all meet to discuss this?

A. We had a meeting, Lionel Jones, Mr. Jones came and asked me, told me that he would like for us to go to Mr. Jendras and talk. And I said, fine, Lionel. We went over there and I think it was after quitting time that afternoon, and we sit down and we talk and we ironed out our differences, and I apologized to Lionel in the office. And we went outside and I apologized again to him, I told him that if I had did some things and said some things that I shouldn't, I am sorry, Lionel. And from then Lionel and I were the best of friends.

Q. That was his opinion, too?

A. Yes, sir, yes, sir.

Mr. Rainey testified he presently is employed in ICGR's clerical department, the job position for which he originally applied at ICGR in 1973. He stated that he took the required tests for a clerical position but was assigned instead off the extra board to a laborer position and reported to Mr. Rutherford. He testified he was not qualified for some positions in the store department, for instance lift truck operator or crane operator. He stated he did not know how to operate the equipment and did not want to operate the equipment. Consequently, he never requested training in these positions. He stated that on the days he was called off the extra board to work in these positions Rutherford would direct him instead to perform menial tasks, i.e., cutting grass, sweeping. He testified he was paid at the rate of the position for which he had been called.

Mr. Rainey also testified he was suspended and/or terminated and then reinstated on more than one occasion. Mr. Rutherford was responsible for his dismissal on one occasion. There was an investigation and hearing. He was dismissed for insubordination when he refused to cut the grass. Mr. Rainey contended he was fired because he would not assure Mr. Rutherford the job would be completed by a requested time. Eventually, approximately one year later, Rainey received a leniency reinstatement.

In 1973, Mr. Rainey filed a charge with EEOC complaining of race discrimination in his job assignment. He stated he received no response from EEOC. On July 16, 1974 he filed a formal grievance against ICGR claiming racial discrimination. In it he made the following complaint concerning Mr. Rutherford:

While working in the store Department under the most racist slave driving of Mr. Billy Rutherford I was denied every opportunity of advancement in his mind I was a laborer (his slave). I worked for a while and then they came up with the extra board in which I was laid off. I would work a day or two out of a pay period because I was disliked by Mr. Rutherford.

Such racism on jobs by supervisors shouldn't be allowed on jobs I have told him to let me train on a job but he pays me no attention. To him I don't have a mind nothing but a machine that he operates for eight hours a day but I am human just like him but I am Black the difference.

Testimony from Rutherford's supervisor, Ron Jendras, indicated that both black and white employees complained of Rutherford's direct and brusque manner. Company performance evaluations indicate Rutherford was an energetic supervisor who got work done and who kept close track of his employees in accomplishing tasks. These performance evaluations, covering a span of several years, indicate that any complaints directed toward Rutherford were generally the result of his gruff manner in dealing with subordinates regardless of race.

Plaintiff also attempted to show racial animus by statements from witnesses that racist remarks were common and that Rutherford was heard to make racial slurs. However, testimony from plaintiff's witnesses was to the effect that unidentified

employees generally made these remarks at unspecified times. One witness, Bland Matthews, testified that he heard Rutherford and others make remarks that contained racial slurs. There was no testimony that these remarks were directed toward an individual. They did not occur, moreover, in Rutherford's department. These remarks were uncorroborated. Rutherford denied making them altogether. During direct testimony he stated the following:

Q. Okay. Now, I would like to ask you some questions, just general questions about your policies in dealing with the men under you, working under you, what was your policy when you were the General Foreman about having employees come into your office which was up in the materials shed?

A. My office was open, I didn't invite either the blacks or the whites in, my door was open. If both came—some came in, some blacks and whites came in, some blacks and whites didn't, but my door was open. I never refused any of them.

Q. During the time that you were General Foreman did you ever use any racially derogatory remarks, comments, names in talking to your employees?

A. No, sir.

Q. You're certain of that?

A. Yes, sir.

Q. Do you recall of ever having been accused of doing that?

A. No, sir.

No other witness testified of any racial remarks made by Rutherford and no regular employee from his department testified that Rutherford made racially motivated jokes or slurs.

The proof does not support plaintiff's contention by a preponderance of the evidence that Rutherford's attitude toward and treatment of black employees was racially motivated. There is evidence in the record that Mr. Rutherford was a demanding supervisor, apparently at times too direct and gruff, and one difficult to feel at ease around. He ordered employees, black and white, to perform tasks they did not want to perform. He testified he frequently observed the work of employees, that he frequently told employees that if they were unwilling to work at tasks as assigned they should go home. Testimony from black and white employees indicates they were treated equally in this regard.

*Job Assignments*

Mr. Payne contends he was wrongfully denied positions for which he was qualified due to his race. Specifically, he claims he was qualified and denied positions as stockman, lift truck operator and crane operator, as well as short term work off the extra board. The parties agree Mr. Payne was senior bidder on the stockman's job, but dispute whether he was senior bidder on other positions.

Even though Mr. Payne was senior bidder on the stockman's job, he was disqualified from this job because he did not have the fitness and ability for the job. The position was subsequently awarded to another black employee, next in seniority.

Defendant contends Mr. Payne could not read and that Mr. Jendras determined Mr. Payne did not qualify for the job. Plaintiff contends that Mr. Rutherford, not Mr. Jendras made this decision and that Rutherford did so out of racial animus. Plaintiff also contends the ability to read had never been a requirement for this position. He claimed he was not required to read when he held this position in Chicago. He claimed that since there were always two stockmen on duty he was not required to read.

The Court concludes the sequence of events are as outlined in defendant's findings of fact # 32–34 and 37–40 and therefore adopts the following statements of fact:

32. In November, 1981, Payne was working as an Extra Clerk in Memphis, having been "rolled" off of his permanent Porter position during the preceding summer. On November 5, 1981 ICGRR posted a bulletin announcing a vacancy in a Stockman position in the Materials Department. [Exhibit 44]. On November 6, Payne submitted a bid for the Stockman position. [Exhibit 1, p. 7]. At the end of the

regular 10–day period for receiving bids, Payne was the Extra Clerk with the greatest seniority who had submitted a bid for the position. [Tr. 545].

33. On November 16, 1981, Dye, who is responsible for the bid process involving Clerk's jobs in Memphis, telephoned R.N. Jendras (hereinafter "Jendras"), Superintendent of the Materials Department [Tr. 596], to advise Jendras that Payne was the senior bidder for the Stockman position. [Exhibit 49; Tr. 545, 610]. Jendras was aware of facts suggesting that Payne could not read or write and, therefore, he believed that Payne probably lacked the necessary fitness and ability to hold the Stockman position on a permanent basis. [Tr. 611]. Jendras told Dye not to award the Stockman job to Payne until he (Jendras) got back in touch with Dye. [Exhibit 49; Tr. 545, 610].

34. Jendras then telephoned Browning and advised him that Payne was the senior bidder for the Stockman position and that he (Jendras) intended to administer a reading test to Payne. Jendras asked Browning, as Payne's union representative, if he (Browning) objected to the administration of such a test. Browning told Jendras that BRAC would not object to the administration of a reading test to Payne if it was job-related. [Tr. 336–67].

37. After Payne was unable to read the materials cards, Jendras telephoned Dye and told him that Payne lacked the fitness and ability to hold the Stockman job and that Dye should award it to the next senior bidder. [Exhibit 49; Tr. 545, 613–14]. Jendras made the final decision to disqualify Payne. [Tr. 696]. Dye then awarded the Stockman job to M.W. Jones (hereinafter "M. Jones"), a black Extra Clerk. [Tr. 545, 614].

38. Jendras believed that Payne's inability to read and write would prevent him from performing essential aspects of the Stockman position. [Tr. 612–613]. There were two basic grounds for Jendras' belief. First, the particular Stockman position on which Payne bid required the employee to work on Saturdays and Sundays, when a Carman might not be present to assist the two Stockmen who were on duty. [Exhibits 44, 54; Tr. 447, 648–49]. Thus, if the two Stockmen were required to work apart from one another at different locations during the weekend, there would be no other employee present who could assist Payne in reading the materials cards. [Tr. 447, 648–49]. Payne acknowledged at trial that he had never worked a Stockman position by himself, either in Chicago or as an Extra Clerk in Memphis, and that he would not be capable of doing so. [Tr. 105–106]. In both Memphis and Chicago, Payne's fellow employee did the reading and writing portions of the Stockman job for Payne. [Tr. 105–11, 147–48]. Second, all of the various Stockman positions in the Materials Department at Johnston Yard are interchangeable. [Tr. 613, 705, 756, 761]. For example, ICGRR's management has the prerogative to require one of the two Stockmen who normally work in area of the box cars to fill in on a temporary basis at the Stockman position in the Materials Warehouse. [Tr. 613, 705]. The Stockman who works in the Materials Warehouse is required routinely to read documents such as packing slips for incoming materials shipments [Exhibit 9] and to fill out documents such as materials disbursement forms [Exhibit 8], and he has no other employee present to assist him. [Tr. 755–57]. Payne admitted at trial that he could not read the packing slips and disbursement forms that are used by the Stockman in the Materials Department. [Tr. 111]. Therefore, ICGRR has demonstrated that Payne was disqualified from the Stockman position for a legitimate, non-discriminatory reason.

39. Black employees who have held permanent Stockman job positions in the Materials Department include Mitchell [Tr. 134], Middlebrooks [Tr. 153, 158], M. Jones [Tr. 195, 745] and Maddox [Tr. 745].

40. As a result of not being awarded the Stockman job, Payne filed a grievance through BRAC. [Tr. 337, 445–47]. Jendras wrote a letter to Browning explaining ICGRR's position regarding Payne's disqualification from the job. [Exhibit 54]. When the parties were unable to resolve

the matter locally, BRAC appealed the grievance to the national level. Graves wrote a letter to BRAC's General Chairman further explaining the basis for Payne's disqualification from the job. [Exhibit 55]. In response to ICGRR's position, BRAC advised Payne that if he could not submit proof that he could read and write, it would be futile to pursue the arbitration any further. [Tr. 338]. When Payne failed to submit the requested proof, BRAC withdrew the grievance.

Jendras located William Rutherford and the two then went to the job site where Mr. Payne was working. The three then went to an area where several box cars were awaiting repairs. Jendras then asked Mr. Payne to read one of the materials cards attached to the side of the box car. The material cards contained certain printed and handwritten information of terms needed for repair of the box car. Mr. Payne stated to Jendras and Rutherford that he could read only small portions of the card. The men proceeded to a second and third box car where Mr. Payne was asked to read the material cards. Mr. Payne could not read either of them.

Plaintiff claims these facts show an intended humiliation. He admitted he could read very little of the first card. Requiring further reading tests was therefore unnecessary and wrongful. Defendants contend, however, neither Rutherford nor Jendras intended to embarrass Mr. Payne. They claim, instead, their actions were intended to provide Mr. Payne an adequate opportunity to demonstrate his qualifications for the stockman's job.

Thereafter, Mr. Payne filed a charge with E.E.O.C. against ICGR, alleging race and age discrimination.

Mr. Jendras testified he made the decision to disqualify the plaintiff for this position. Plaintiff attempts to dispute this testimony by stating Jendras relied upon Rutherford to determine these matters and "Rutherford's decision was the sole basis for disqualifying plaintiff on a job." A careful reading of this statement in context (Tr. 686–687), however, indicates Jendras' statement was made in reference to the fork lift operator's position. There is no credible rebuttal of Jendras' testimony that he alone made the decisions to disqualify Payne.

Rutherford's participation was not the decisive factor in Payne's disqualification. Plaintiff has not alleged racial animus on the part of Jendras nor is there evidence of racial animus on Jendras' part.

A large part of plaintiff's proof focussed on the fact Mr. Payne was not required to read the material cards. He stated two men always worked the shift. One read material cards, instructions, etc. and the plaintiff loaded and unloaded materials needed for repair of box cars. It was Mr. Payne's position that since two men were always on duty, he was not required to read and therefore qualified to be a stockman. Plaintiff reasoned that if he had worked in this position in the past [in Chicago] without complaint, he was fit for the present permanent position in the Memphis district. Therefore denying plaintiff the position then had to be due to Rutherford's alleged racial bias.

Plaintiff testified that he performed in this position on a temporary basis in the Memphis yard. He never received complaints regarding his performance. He stated the job in Memphis involved a three man team, two stockmen and a carman. A carman would read cards attached to the side of a box car and tell the stockman materials to remove from the supply truck and where to place the materials on the car. Plaintiff's witness, Everett Mitchell, Jr., a retiree, worked for fifteen years in the storeroom. A part of this period he worked as a stockman. Mr. Mitchell stated there were always two stockmen on duty, that he never worked alone even though he worked a Wednesday through Sunday schedule.

This is contradictory to testimony given by Mr. Robert Maddox, a black male employed at ICGR as a dockman for fifteen or sixteen years. Mr. Maddox who had worked in the stockman's position nine years earlier stated he was required to read and write when he held the position. He testified he sometimes worked alone

and that on occasion he had been called on to act as stockman in other departments or areas of ICGR. He stated he had to read and write when he worked the stockman position in those departments.

### Crane Operator

■ Plaintiff claims he was wrongfully denied the permanent position of crane operator. He claims he was senior bidder and qualified by virtue of his Chicago experience with the crane but Mr. Rutherford disqualified him out of racial bias. Defendant disputes plaintiff's contention he was senior bidder or qualified. Defendant claims instead plaintiff's claim is that he was not trained by ICGR to operate the crane which would enable him to work the position off the extra board. Testimony and proof in the record do not support plaintiff's position.

Mr. Payne testified he worked in Chicago in a permanent position as assistant crane car operator. He stated he "used to run them [the crane] in Chicago." He described his position during examination by adversary counsel:

Q. Your permanent position was an Assistant Crane Car Operator?

A. Yes, that was my permanent job.

Q. What does an Assistant Crane Car Operator do?

A. An Assistant Crane Car Operator, he hooks up, he hooks up and unloads car, carry wheels, and unhooks, that's all, unhooks the train.

Q. He does everything he can to help the guy who is actually the Crane Car?

A. That's right.

Q. An Assistant Crane Car Operator position does not require you to actually operate the Crane Car, is that correct?

A. Only when he is on vacation and sick, taking personal days or sick days.

Mr. Payne stated that on some unspecified date he was disqualified by Rutherford and that he could run the crane then used by ICGR. He stated he had a thirty-day period to show Rutherford he could operate the crane. He stated new cranes were used later by ICGR but with training he could have operated the new cranes. He stated ICGR refused to train him, that

Rutherford said, "Well, come on down here sometime on your own time." He stated he went down to the railroad numerous times but the crane was always unavailable according to Rutherford. He testified two white employees were trained to operate the crane when he was denied training. Because he was denied this training, he stated he was forced to continue working off the extra board. Mr. Payne filed a grievance with BRAC. Mr. Browning submitted the grievance to the Chicago office which ruled in favor of ICGR. The nature of this grievance was plaintiff's complaint he should have been trained but was not trained by ICGR on company time.

Mr. Leland Dye, a thirty-three year employee and ICGR's director of industrial services, testified as a part of his duties he was responsible for job assignments of clerks in the Memphis district. He testified Mr. Payne was never senior bidder on the crane operator position. This was corroborated by Mr. Ron Jendras, who also testified Mr. Payne was never senior bidder for this position. Mr. Jendras, was ICGR's materials superintendent and supervisor of Mr. Rutherford and others assigned to the department, including on occasion Mr. Payne.

Mr. Jendras investigated Mr. Payne's grievance regarding the crane position. Adversary counsel elicited from the following testimony concerning the nature of Payne's grievance:

Q. And it's your testimony that Mr. Payne never asked you until 1984 to be trained on the Crane Car?

A. That's right.

Q. Did he come down on the weekends seeking training?

A. I found out about that when Mitchell testified, that's the first that I knew of it. Mr. Payne apparently was there but he never mentioned it to me.

Q. Didn't Mr. Payne tell you that he had been requesting training from Mr. Rutherford on several occasions?

A. No.

Q. And Mr. Rutherford refused it?

A. No.

Q. Well, he said it in his grievance, didn't he, that you read?

A. Which grievance? I don't—

Q. Exhibit 50, the last paragraph first sentence, what does it say?

A. "Clerk Payne also stated that he wasn't fully qualified to operate the Crane Car, but had asked Foreman Rutherford on several occasions for the opportunity to train to operate the Crane Car, but as yet was not allowed the opportunity to do so while junior clerks had been given training on the Crane."

Mr. Jendras stated in earlier direct testimony that based on that information he assumed Mr. Payne lacked the fitness and ability to operate the crane:

Q. Now, turning your attention to Exhibit 50, which is the letter from Mr. Browning to you, what does Mr. Browning say about Mr. Payne's qualifications to run the Crane Car?

A. All right. In the last paragraph Mr. Browning is saying: "Clerk Payne also stated that he wasn't fully qualified to operate the Crane Car, but had asked Foreman Rutherford on several occasions for the opportunity to train to operate the Crane Car, but as of yet was not allowed the opportunity to do so while junior clerks had been given training on the Crane Car."

Q. What did you assume from that letter about Mr. Payne's qualifications to operate the Crane Car?

A. That he did not have the fitness and ability to operate it.

In regard to training employees, Mr. Jendras, as well as others, testified ICGR had no formal training program for employees, black or white, who worked off the extra board. He stated extra clerks could learn to operate equipment on their own time, however, if the equipment was available and the training supervised. In this regard, he testified as follows during examination by adversary counsel:

Q. Joe Black, when was he trained?

A. I'm not sure about Joe Black, if he started to work for me when I got there or prior to it.

Q. So, you can't say of your own knowledge that Mr. Joe Black was trained on company time to do that job, can you?

A. That's the only way they could have been trained if they were given permanent positions.

Q. Well, you have learned in the course of this trial that Mr. Payne and Mr. Mitchell or Mr. Mitchell did some training of Mr. Payne on the weekends on his own time, you say it's the only way that these people could have learned?

A. I was never aware that Mr. Payne trained on the weekend other than one time, and I probably wouldn't have been aware of that except somebody knew I was in the office.

Q. And Mr., you really don't know how Mr. Black trained, do you?

A. If he was on a regular position, he would have had to train on his own time—I am sorry, on company time if he was on a regular position.

Q. But now does this training apply to all types of positions, the rule?

A. I'm not sure I understand your question.

Q. Well, you have stated a rule, as I understand the rule it's if you come down on a bid job and you had the fitness and ability to do the job but you never worked on a job, that the company will train you, is that right?

A. If you're awarded permanent position, yes, sir.

Q. Okay.

A. There is time, and if the individual takes it upon himself, his job is pretty well caught up, start looking, gee, here is how the lift truck runs, you know, you got to have a little ambition, too. We got probably some people just happy to do laborer's work.

Q. And then the second part of that rule is that if you come off the extra board for a job that you are not protected that you are not qualified to do, the company doesn't train you?

A. Right, they do not train you.

Q. What's the basis for that rule, the second part of that rule?

A. You may not see that employee again for another week or two or month, or you may not see him again.

Q. So, you are not going to let him learn how to operate a fork lift?

A. When they usually come for one day and don't know how to operate anything, you put them to work doing anything.

Q. What about Mr. Payne, he wasn't usually coming one day and he came quite often, several times before you disqualified, and several times after?

A. I don't know when Mr. Payne is coming until the next morning.

Q. But you know that he is a reporter?

A. Yes, sir.

Q. He is not a person that you would never see again?

A. Yes, sir.

Q. Well, is there an exception to the no qualification of extra board people if they come often?

A. No, we don't know when they're coming.

Q. What about Extra Clerks who are new, isn't part of the training, isn't part of the program there for Clerks to train them in as many jobs as possible so that they are qualified to work when there's a vacancy?

A. At one time years ago they had that program. I think with the Merger Agreement that ended in, I want to say 1975—no, probably about '77.

Q. But in '77, '78 they didn't have a program of qualifying every Clerk for as many positions as possible?

A. Not as far as I can recall.

As a part of his investigation into plaintiff's grievance, Jendras contacted Payne's Chicago supervisor, Al Scampini. Based on discussions with him and Mr. Payne's statement in his grievance, Jendras concluded Mr. Payne had never operated a crane. Mr. Jendras was also in contact with Pat Powers director of ICGR's labor relations department in Chicago. Mr. Jendras testified he made note of his conversation with Mr. Powers:

Per phone conversation with Pat Powers, let Payne know that there are important aspects in operating this piece of equipment and maintaining same. Go over this with him when he has read the manual.

As a result, Jendras made arrangements for Mr. Payne to pick up a copy of the crane operator's manual. He stated that, although he knew Payne could not read, he believed Mr. Payne could get help with the manual.

The Court adopts the following conclusions of fact submitted by defendants regarding results of Jendras' investigation:

51. After several unsuccessful attempts to reach Browning by telephone, Jendras finally talked to Browning on September 13, 1984 and told Browning to have Payne see him about the operator's manual for the crane. [Exhibit 50, hand-written notes on bottom of page; Tr. 619, 625]. Thereafter Payne went to Jendras' office and Jendras gave Payne a copy of the operator's manual. [Exhibit 56]. Jendras told Payne that he did not need to know everything in the operator's manual, but that he should familiarize himself with the crane's basic operation and routine maintenance. [Tr. 626]. Jendras knew that Payne could not read, but he believed that there were other persons available who could read the relevant parts of the operator's manual to Payne. [Tr. 626].

52. On or about April 28, 1985, Payne told Jendras that he wanted to train on the crane. Jendras told Payne to get together with Everett Mitchell, Jr., (hereinafter "Mitchell") who was the Crane Operator at the time, and observe Mitchell. [Exhibit 52; Tr. 627–28]. Mitchell later told Jendras that Payne had observed the operation of the crane for approximately one-half hour and then left. [Tr. 628]. Since that time, Payne has not contacted Jendras or any other supervisor in the Materials Department and expressed a desire to demonstrate his qualifications to operate the crane. [Tr. 628]. Therefore, Payne has failed to show that ICGRR's failure to allow him to operate the crane was racially discriminatory.

53. In recent years, the qualified Crane Operators in the Materials Department

have included Mitchell [Tr. 136, 142, 627–28], Carlos Middlebrooks (hereinafter "Middlebrooks") [Tr. 153], Bland Matthews (hereinafter "Matthews") [Tr. 173], Robert Maddox (hereinafter "Maddox") [Tr. 757], Adolph Marmon (hereinafter "Marmon"), [Tr. 627–28] and J.L. Jones (hereinafter "J. Jones") [Tr. 745], all blacks. All of these employees assumed their job positions while Rutherford was the General Foreman in the Materials Department.

Mr. Payne failed to show by testimony or otherwise that white employees similarly situated were allowed to train on the job to operate the crane. Further, in regard to the thirty-day period he claims was due him to qualify for the crane position, the testimony was unrefuted that this policy did not apply to plaintiff's situation. The testimony (Tr. 58, 285–86) showed that under the terms of the collective bargaining agreement this applies only to those employees who have been successful bidders on a permanent job position. ICGR stated a formal company-funded training program was not practical under these circumstances. Testimony showed this policy was applied uniformly to ICGR extra clerks, irrespective of race.

*Lift Truck Operator*

Mr. Payne also claims that he was senior bidder but denied the opportunity to fill a vacancy as a Lift Truck Operator. Specifically, he claims that in November and December of 1981 two extra clerks with less seniority were called by the Chief Clerk to fill the openings. Mr. Payne claims he informed both Leland Dye and William Rutherford from the beginning of his employment that he operated a lift truck in Chicago. He claims Rutherford refused to let him demonstrate his fitness to operate the equipment or to let him train on the lift truck. He claims Rutherford accepted the word of white employees that they could operate a lift truck or that whites were allowed to train on the job for their position when he was denied the opportunity.

In December 1981, Mr. Payne filed a formal grievance which was not resolved until August 14, 1984 after arbitration before the National Railroad Adjustment Board (NRAB). Plaintiff testified that he presented no evidence during any of these proceedings to support his claim he was qualified to operate a lift truck, only his assertion he ran the lift truck. The NRAB held in favor of the railroad (Award No. 24950—Exhibit 19). The Board made a specific finding that the "record reveals that a Lift Truck Operator must have specific training for that position. Claimant did not have that training.".

Regarding the allegation that Payne was qualified for the Lift Truck Operator's position because he had been called as an unqualified Extra Clerk and allowed to "sit" on the position, the NRAB further concluded as follows:

In addition, the record indicates that while Claimant was called to fill this position in the past, he was not allowed to drive the lift truck on those occasions. Instead, he did other laborer duties which did not involve the operation of Carrier's equipment. Accordingly, he was not qualified either by experience or training, to function as a Lift Truck Operator on the days in question.

Our finding is consistent with that of Public Law Board No. 1812, Award No. 45. There the Board concluded that, "Claimant was not qualified automatically for the position in question by the fact that he filled the position on various occasions in the past." Here, too, Claimant's prior occasional filling of the position did not automatically qualify him to actually perform as a Lift Truck Operator on the claim dates. [Exhibit 19, p. 2]

At some date following the NRAB decision, but in 1984, plaintiff demonstrated to Rutherford his ability to operate a lift truck and his name was placed on the Chief Clerk's list of qualified lift truck operators.

The focus of plaintiff's claim appears to be that 1) he was not allowed to train on company time to operate the equipment, 2) that Rutherford accepted the word of white employees regarding their fitness to operate the equipment, 3) that he had to demonstrate his fitness but was not given the opportunity to demonstrate his fitness until 1984.

In support of his contention that on-the-job training was due him, plaintiff elicited the following testimony from Mr. Browning (Tr. 478-479):

Q. Wouldn't the fact that the person or the extra board people were not qualified on the job and no one to work that job and it remained vacant, wouldn't that force the railroad to train these people?

A. It would ultimately result in a loss of a job. And the purpose of letting these people sit on the job is to get trained and they are being paid and they will get some knowledge of this job. They will do some work on the job with the help of the employees around there, it is our feeling it is benefiting the employee to get them familiar with the job, benefiting the railroad by not having that work go undone, it is other people around them that help them with the job.

Q. So, the purpose is when Mr. Payne would be called down off the extra board, and the company's contention not qualified to do the fork lift job, that he was called down to do the fork lift job, one of the purposes was to benefit Mr. Payne by training him on that job?

A. Yes, sir, get him more familiar with the job.

Q. Assisting to train him?

A. That was the purpose of us setting this thing up with the company.

Q. Would it be right for the company, every time a person comes down on a fork lift job off the extra board, to put them doing menial jobs such as cutting the grass, sweeping the floor, and not let them train on the fork lift job?

A. Well, I don't think it would be right for them to do it every time. Of course, this is a machine that has got to have, you know, an operator on it, so I think they would be obligated to train him some on the job while he was there.

Q. And is it in the discretion, on the fork lift job, for Mr. Rutherford to decide whether or not to train Mr. Payne that day?

A. Well, it is always discretionary with the company as to when they can train them on certain jobs.

Mr. Jendras, however, testified as follows in regard to on-the-job training for extra board employees (Tr. 616-618):

Q. Okay. Why was he not trained—strike that.

On those five or six or seven days, however many it was, was he trained to operate the lift truck?

A. No, sir.

Q. Why not?

A. Off the extra board we don't usually train the employees. A lot of times the equipment may be broken down, he may not have anything to do with that piece of equipment for two or three hours, and the man power may not be there to show him how to operate the piece of equipment.

Q. Okay. Do you know specifically why Mr. Payne was not trained to operate the lift truck on those five or six or seven days that he was called prior to December 1981?

A. I wasn't aware that he had ever operated a lift truck before.

Q. Well, do you know why he was not trained on those days?

A. No.

Q. Is there any sort of formal training system to train employees who are assigned to your department off of the extra board when they have not previously been qualified?

A. No, we don't usually train Extra Clerks, because you may have them one day this week, you may see them next month for one day, and you may see them six months later.

Q. If an Extra Clerk, who is not qualified to do a particular job position in your department, wishes to qualify for some job, does that employee train on his own time or on company time?

A. On his own time.

Q. Does that policy apply equally to black and white Extra Clerks?

A. Yes, sir.

Q. In the time period 1980 to 1982 was that policy applied equally, in fact, to black and whites?

A. Yes, sir.

Q. Now, how about the training of a person who has bid on to a permanent job position and been deemed to have the fitness and ability to hold the position but may get on to the job and not be fully qualified, is that person trained on his own time or company time?

A. On company time.

Q. In the time period 1980 to 1982 was that policy applied equally to blacks and whites?

A. Yes, sir.

Q. Do you know of any black employees who were trained on company time to operate the lift truck and the Crane Car in the time period 1980 to 1983?

A. Yes, sir.

Q. Okay. Give me some names?

A. You have an employee Joe Black, Robert Maddox, Robert Robinson, Adolph Marmon, J.L. Jones, Everett Mitchell, those are the ones that I can think of right now.

Q. All of those employees are black?

A. Yes, sir.

Q. Had all of those employees that you just named bid on permanent job positions and been the senior bidders?

A. Yes, sir.

Q. Okay. Was there ever an occasion where Mr. Payne had bid on a permanent job position to either operate the lift truck or the Crane Car and been the senior bidder?

A. Not to my knowledge.

Plaintiff also claims Rutherford accepted the word of two white employees, Mr. Maestri and Mr. Wade, who claimed they were qualified to operate the lift truck. They were not required, he claims, to demonstrate their fitness as he was. In support of this contention, counsel elicited the following testimony from Mr. Maestri (Tr. 771–772):

CROSS EXAMINATION

BY MR. DONATI:

Q. You have always been qualified on the lift truck in the storeroom?

A. I ran a lift truck somewhere else before I hired on at the railroad.

Q. Who did you tell that to?

A. Bill Rutherford.

Q. And then he let you work a lift truck?

A. Well, I had to take it down on the platform and run it out in the open for a while first.

Q. Did you ever have to file any grievances to get an opportunity to demonstrate to him that you could operate the lift truck?

A. No, sir.

Q. Did you ever have any difficulty—if you tell Mr. Rutherford that you were able to operate the lift truck and he took you that day to operate it?

A. I didn't tell him, somebody else told him that I could operate it.

Q. Who told you that if you know?

A. Bobby Albritton.

Q. Who is he?

A. I worked with him at another job, too. Extra Clerk at the railroad, worked down at the storeroom.

Q. Was he in the storeroom at the time?

A. Yes, sir.

Q. And did you at that point start working the fork lift or the lift truck as it is called?

A. Yes, sir.

Q. Has Mr. Rutherford ever called you down for the lift truck job and told you you wouldn't, you weren't qualified and had you cut grass?

A. No, sir.

Q. Now, when were you called down to the storeroom and asked to cut grass?

A. Just on various jobs I was working. No, he wouldn't call per se to come and cut grass. It would be a stockman's job, fork lift job, just any job.

Q. How many times have you cut grass down there?

A. A bunch.

Q. How long have you worked, nine years?

A. Yes, sir.

Q. Now, you hired in in 1977?

Mr. Wade, during cross-examination by plaintiff's counsel, testified he had always worked the fork lift (Tr. 778–780):

## CROSS EXAMINATION

BY MR. DONATI:

Q. Mr. Wade, do you work in the office with Mr. Jendras?

A. Yes, sir.

Q. Okay. Have you been subpoenaed to testify today?

A. No, sir, I was asked to come, I wasn't subpoenaed.

Q. Who asked you to come?

A. Mr. Jendras and the attorneys.

Q. Okay. When is the last time that you used the creosote?

A. Approximately three years ago.

Q. You worked the fork lift job?

A. Yes, sir.

Q. Did you train on that job?

A. I already knew how to operate a fork lift.

Q. Before you came to the railroad?

A. Yes, sir.

Q. Was there ever a period of time that they wouldn't let you work the fork lift?

A. No, sir.

Q. How did the railroad know that you or how did the people in the Store Department know that you had worked the fork lift?

A. My military record.

Q. Is that what you did in the military?

A. Yes, sir.

Q. The Stockman's job, did you train on that?

A. No, sir.

Q. What about the, what did you say, Crane Car or Crane Operator?

A. Crane Operator.

Q. Did you train on that?

A. No, sir.

Q. Had you ever worked a crane before?

A. Yes, sir.

Q. Where was that at?

A. Military.

Q. Was Mr. Rutherford supervisor when you hired on at the railroad, the General Foreman?

A. I can't say because I was hired at Fulton, Kentucky at the time when I hired out at '67.

Q. When did you come to Memphis?

A. '69.

Q. How did you get here?

A. Bid on a job.

Q. From Fulton?

A. Yes, sir.

Q. They have the same seniority—

A. Yes, sir.

Q. —district at that time?

A. Yes, sir.

Q. Mr. Rutherford was here at that time when you arrived in Memphis as the General Foreman?

A. Yes, sir.

Q. Have you ever socialized with Mr. Rutherford?

A. No, sir.

Q. Ever been fishing with him?

A. No, sir.

In regard to his qualifications and prior experience, Mr. Payne testified thusly (Tr. 99–100):

Q. Let's talk about the Lift Truck Operator position first.

I believe—let me ask you a little bit more about your work in Chicago regarding the lift truck, okay?

A. Okay.

Q. You didn't have a permanent position as a Lift Truck Operator in Chicago, right?

A. No.

Q. Now, how did you come, I think that you said that you had driven the lift truck while you were in Chicago?

A. Oh, yeah, I had driven the lift truck.

Q. Okay. Tell me how it came about that you drove the lift truck in Chicago?

A. Well, I, well, I, like on overtime or something like that, we had an overtime board, and like I would be called out, I would be the oldest man for overtime, it would be my turn for working, and we would have to run it in the warehouse just to pick up something. Like they

come in, machinist come in for stuff, and they want stuff that's over our head and big warehouse, and we have to pick it up and sit it down for them or take it to them.

Q. About how long did you operate the lift truck in Chicago?

A. I don't know, I guess about, I guess it was about, about, about three or four times.

Rutherford testified during examination by adversary counsel that Mr. Payne never told him he was qualified to run the lift truck and did not know he wanted to demonstrate his fitness on the equipment until Mr. Dye called him. He said Mr. Dye stated plaintiff "wanted to come down and see if he could run the lift truck." Mr. Payne and Mr. Dye then went down to the platform. Mr. Rutherford watched Mr. Payne operate the lift for about an hour and a half after which Rutherford told Mr. Dye he would qualify plaintiff for the lift truck. Rutherford testified that Payne received no formal training on the lift truck, that he must have learned to operate the lift truck when he worked weekends. Rutherford also stated he would not allow plaintiff to operate the fork lift prior to this because he believed plaintiff was not qualified to operate the fork lift. He stated that if, prior to this occasion, Mr. Payne was assigned off the extra board for the fork lift job he was not permitted to operate the fork lift. Mr. Rutherford stated he was unaware whether Mr. Payne had filed grievances. Rutherford stated he typically did not know anything about grievances because the office handled them. Rutherford stated he would have allowed Mr. Payne to demonstrate his fitness to operate the lift truck at any time he had asked.

█ In order for two or more employees to be considered similarly-situated for the purpose of creating an inference of disparate treatment in a Title VII case, the plaintiff must prove that all of the relevant aspects of his employment situation are "nearly identical" to those of the non-minority employees who he alleges were treated more favorably. *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d

1181, 1185 (11th Cir.1984). The similarity between the compared employees must exist in all relevant aspects of their respective employment circumstances. *Smith v. Monsanto Chemical Co.*, 770 F.2d 719, 723 (8th Cir.1985); *Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63, 68 (6th Cir.1985).

█ Regarding Mr. Payne's allegations concerning on-the-job training, it is clear from the testimony and record that it was not the policy of ICGR to provide such training to those working off the extra board. Mr. Browning stated the Union's position that this training was desirable and preferable. However, he did not state, nor did the plaintiff show, that this was policy from which Rutherford deviated for racial reasons. The record and testimony nowhere reflect that other similarly situated white employees (extra board) were treated more favorably. Testimony indicated that many black employees in permanent positions received on-the-job training for the lift truck and crane operator positions. Mr. Payne was never successful bidder for a permanent position as lift truck operator, nor even the senior bidder. The Court concludes there is no basis in fact to support plaintiff's contention he was denied on-the-job training due to racial discrimination.

The Court concludes as well that the circumstances surrounding Wade and Maestri's operation of the lift truck were different from plaintiff's situation. Maestri testified that he operated a lift truck before joining the railroad. He stated a clerk named Bobby Albritton told Rutherford he could operate the lift truck. Maestri had worked with Albritton on a previous job. However, even though Albritton and then Maestri told Rutherford Maestri had run the lift truck on his former job, Rutherford required that Maestri demonstrate his ability. Maestri testified, "I had to take it down on the platform and run it out in the open for a while." Maestri also testified that he learned to operate the crane after he joined ICGR but on his own time.

Wade on the other hand operated the lift truck and the crane during his military service and this was reflected in his mili-

**1334**

tary record. Furthermore, he transferred to Memphis from the Fulton district. He stated he came to Memphis by bidding on the position in Rutherford's area.

Rutherford testified that when Payne asked to operate the lift truck he was given the opportunity. He stated Mr. Payne had never asked before. Mr. Payne did not testify that he had ever asked; only that he had told Rutherford "a bunch of times" he had operated the lift truck in Chicago. Mr. Rutherford said Payne did not advise him he was qualified to operate the lift truck. Moreover, there is no evidence in the record that Payne was qualified to operate the lift truck. In fact, the NRAB specifically found that at the time in question, Mr. Payne was not qualified to operate this equipment, a decision Mr. Payne did not appeal. That ruling therefore—that Mr. Payne was not qualified to operate a lift truck—is final and binding on him. 45 U.S.C. § 153(m); *Union Pacific R. Co. v. Price*, 360 U.S. 601, 79 S.Ct. 1351, 3 L.Ed.2d 1460 (1959) (party cannot relitigate issue in subsequent lawsuit after litigated on merits before NRAB).

There is no evidence in the record that demonstrates plaintiff was qualified to operate the lift truck, nor that Mr. Rutherford knew or thought Mr. Payne was qualified but denied him the opportunity to demonstrate his fitness and qualifications due to his race. Based on the circumstances, witness credibility and the applicable law, Mr. Payne has failed to show by a preponderance of the evidence that he was denied a position as fork lift operator because of his race.

The Court finds therefore that Mr. Payne has failed to show by a preponderance of the evidence that he was denied seniority rights, that his transfer to Memphis was delayed for racial reasons or that he was denied the positions in question due to disparate treatment for racial reasons. The Court concludes this action should be dismissed and judgment entered in favor of defendant Illinois Central Gulf Railroad.