940 F.2d 662
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Daniel P. RUTH, Plaintiff-Appellant,
v.
The CHILDREN'S MEDICAL CENTER, Defendant-Appellee.
 No. 90-4069.
 United States Court of Appeals, Sixth Circuit.
 Aug. 8, 1991.
 
 Before RALPH B. GUY and ALAN E. NORRIS, Circuit Judges, and BAILEY BROWN, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Plaintiff, Daniel P. Ruth, brought this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e et seq., alleging discriminatory discharge. Defendant, The Children's Medical Center (CMC) in Dayton, Ohio, terminated plaintiff's employment as a pharmacist on the grounds that plaintiff failed to check medications prepared by pharmacy technicians. Plaintiff, a male homosexual, alleged disparate treatment based on sex, asserting that female employees were not discharged for committing comparable infractions. The magistrate granted summary judgment in favor of defendant on the ground that plaintiff failed to present evidence sufficient to establish a prima facie case of discrimination. Ruth appeals from the grant of summary judgment.[1] For the reasons set forth below, we affirm.
 
 I.
 
 2
 A review of the record demonstrates the following underlying facts. CMC operates a pharmacy that is staffed 24 hours a day by pharmacists and pharmacy technicians. Pharmacy technicians are not pharmacists nor trained in pharmacy; they work under the direction of pharmacists who, under state law, have the duty of checking the work of the pharmacy technicians.[2] At CMC, pharmacists supervising pharmacy technicians must verify product selection, preparation, and labeling, and check that the product corresponds with the physician's order for the proper patient.
 
 
 3
 Among other duties, pharmacists and pharmacy technicians are responsible for the medication carts used throughout defendant's facility. Medication carts contain all of the medications needed for patients on the hospital's floors for a 24-hour period. The preparation and ultimate delivery of the medication carts involves a five-step process: (1) the pharmacist enters the medication order into the computer; (2) the first shift pharmacy technician prepares the medication doses for the medication cart; (3) the second shift pharmacist checks the doses; (4) the third shift technician verifies the doses as he or she fills the medication cart; and (5) the third shift pharmacist checks the medication cart to verify that everything is correct. The medication carts are then delivered to the appropriate floors throughout the hospital.
 
 
 4
 CMC employed plaintiff as a third shift pharmacist. Plaintiff acknowledged in his deposition testimony that, as a staff pharmacist working the third shift, it was his responsibility to, inter alia, supervise the third shift technician's work, as well as to check the medication carts before they left the pharmacy for delivery to the various hospital floors.
 
 
 5
 At all times relevant to this action, Diane Gary was CMC's Director of Pharmacy. As director, Gary's primary responsibilities were managerial--she managed personnel, the budget, the outpatient pharmacy, and the poison control center. She was also responsible for staff development and education, and on rare occasions Gary performed the duties of a staff pharmacist working in the pharmacy itself.
 
 
 6
 On June 26, 1988, Kevin Phipps, a third shift pharmacy tech who frequently worked with plaintiff, complained to Gary that plaintiff regularly failed to check the medication cart, the fifth step in the five-step process for processing and delivering medications to the hospital's patients. According to Gary's deposition testimony, Phipps "relayed incidents of how he would prepare the doses and ask [Ruth] to check them and [Ruth] would say I trust you, send them up." Gary testified that Phipps told her this had been happening "for a fairly long period of time." (App. 158). Phipps, in his own deposition, testified that Ruth would leave the department or talk on the phone for extended periods of time and that Ruth's failure to check the medication cart and medication orders was "almost a nightly occurrence." (App. 177).
 
 
 7
 Gary testified that she investigated Phipps' allegations by talking to other third shift employees and that some of these employees expressed concern over Ruth's lack of thoroughness in checking the medication cart. Gary testified that upon confronting Ruth with these allegations, Ruth first denied that he ever failed to check medications but eventually admitted that he did not check the work of pharmacy technicians, explaining that he had faith in his technicians. Based on the employee complaints and Ruth's acknowledgement, Gary terminated Ruth for failing to check medications prepared by pharmacy technicians. Subsequently, Gary made an oral report to Ohio's pharmacy board informing the board that plaintiff had not conformed with state law with respect to his responsibility for checking medications.
 
 
 8
 Ruth challenged his employment termination through CMC's internal grievance procedure, and the termination was upheld at every stage of the proceedings. Plaintiff subsequently filed a complaint with the Ohio Civil Rights Commission (OCRC) and the Equal Employment Opportunity Commission (EEOC), alleging that defendant had discriminated against him on the basis of sex because Diane Gary, a female employee, had also failed to check medications but was not fired for her error. Plaintiff also alleged that he was subjected to sexual harassment and intimidation because of his sexual preference. The EEOC adopted the OCRC's finding that the evidence obtained during investigation did not establish a violation of Title VII and issued plaintiff a notice of his right to sue defendant in district court.
 
 
 9
 Plaintiff thereafter filed this action alleging that defendant discriminated against him on the basis of sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e et seq. The parties consented to referral of the case to the magistrate, and, following discovery, defendant moved for summary judgment.
 
 
 10
 In his memorandum in opposition to defendant's motion for summary judgment, plaintiff claimed that he had been the target of reverse sex discrimination, and he alleged three instances in which defendant had treated him differently than similarly situated females. First, Ruth alleged that he was disparately treated, in December 1986, when he was given a final written warning based upon a sexual harassment complaint filed against him by a pharmacy technician. The warning, signed by plaintiff, stated that "a sexually intimidating environment was created" due to behavior that co-workers considered as offensive. (App. 143). Ruth maintained that the incident involved a one-time, off-color comment that offended a technician. Yet, according to Ruth, when he reported to the Director of Human Resources instances of sexual harassment directed at him because of his homosexuality, he never received any follow up regarding his complaint. Ruth argued that female and male employees alike have the right to work in an environment free of sexual harassment and that the employer has an obligation to investigate all complaints equally.
 
 
 11
 As a second example of disparate treatment, Ruth alleged that, in April 1987, defendant gave him a final written warning for a medication error, while the nurses who administered the particular medication to the infant patient were only counseled. Further, Ruth cited an instance where a female pharmacist was only counseled when she made a medication error. Ruth argued that pharmacists and nurses should bear equal responsibility for medication errors and that all pharmacists who make medication errors should be equally disciplined for similar errors.
 
 
 12
 Finally, as a third example of disparate treatment, Ruth pointed to an instance where Diane Gary, when she was covering a shift in the pharmacy, forgot to check medications that were supposed to be checked by the second shift pharmacist. Plaintiff argued that Gary's error was no different than his failure to check medications, yet Gary was not similarly disciplined. Plaintiff claimed that the three instances of different treatment constituted a pattern of discriminatory acts sufficient to establish a prima facie case of reverse sex discrimination. Throughout his argument, plaintiff also contended that his case revealed defendant's practice of treating male homosexuals differently than similarly situated females.
 
 
 13
 In reply to plaintiff's arguments, defendant argued that the situations cited by plaintiff did not involve similarly situated employees. Defendant argued that it is rare that Gary fills in as a staff pharmacist and that she only does so when there is a heavy workload or other problem. According to Gary's affidavit, her mistake was a one-time, unintentional oversight, not a series of willful omissions like Ruth's errors. According to Gary, she had volunteered to check the medications that were supposed to be checked by the second shift pharmacist, and her error, unlike Ruth's repeated omissions at the final stage of inspection, involved step three in the five-step process. Gary further stated that she never failed to check the medication cart at the final step in the five-step process.
 
 
 14
 With respect to plaintiff's medication error for which he received a final warning in April 1987, defendant presented evidence that Ruth had dispensed phenobarbital at ten times the prescribed dosage, a mistake that could have caused the infant patient receiving the drug to suffer respiratory failure or cardiac arrest. Although this did not happen, the patient was required to spend several extra days on a ventilator while being weaned from the drug. Although defendant admitted that Ruth's error was deemed serious enough to issue him a final warning and that the nurses who administered the drug were only counseled, defendant did not concede that the responsibilities or duties of the nurses made them as culpable for the error as Ruth.
 
 
 15
 Although CMC acknowledged that a female pharmacist was only counseled for making a medication error, defendant maintained that the error was dissimilar to plaintiff's error in dispensing phenobarbital. Lois Fangman, the female pharmacist at issue, dispensed five grams of Azactam when five grams of Azlocillin had been ordered. Defendant presented an affidavit from Gary's successor as Director of Pharmacy, John Van Eeckhout, wherein Eeckhout stated that both medications are penicillin-type products used for treating essentially the same infections and that the consequence to the patient from Fangman's error was insignificant.
 
 
 16
 Concerning Ruth's allegation that his complaints of sexual harassment were treated less seriously than complaints filed by females, defendant submitted the affidavit of Karen Borgert, defendant's Employee Relations Consultant. Borgert stated that at no time did Ruth ever register a formal complaint of sexual harassment. Rather, Ruth approached Borgert to complain that a female security guard was spreading rumors about Ruth's sexual preference and Ruth's relationship with another male employee. According to Borgert, after discussing the situation, Ruth and Borgert agreed that Borgert would handle the problem informally by talking to the security guard, which Borgert did. Although Borgert acknowledged that she did not follow up with Ruth concerning the results of Borgert's meeting with the security guard, Ruth admitted that he also did not pursue the matter any further. Ruth, in his deposition testimony, corroborated Borgert's assertion that the two of them agreed that the matter would be handled informally. Ruth further testified that the rumors of his relationship with another male employee were true.
 
 
 17
 Finding that plaintiff's alleged examples of disparate treatment did not involve similar situations, the magistrate concluded that plaintiff had failed to present facts sufficient to find that he was treated differently than similarly situated females and that, therefore, Ruth had failed to raise an inference of discrimination. The magistrate granted summary judgment to defendant on the ground that plaintiff was unable to establish a prima facie case of sex discrimination.
 
 
 18
 On appeal, plaintiff argues that the magistrate erred in holding that plaintiff did not establish a prima facie case. Specifically, plaintiff argues that (1) there exist genuine issues of material fact on the question whether he was treated differently than similarly situated female employees, and (2) the magistrate applied incorrect criteria for determining whether employees not discharged were similarly situated to Ruth.
 
 II.
 
 19
 Plaintiff's pleadings and arguments before the magistrate created some confusion, as noted by the magistrate (app. 109), concerning the cause of action asserted by plaintiff. Therefore, before addressing the propriety of granting summary judgment on plaintiff's disparate treatment claim, we first clarify what is not at issue on plaintiff's appeal.
 
 
 20
 It might appear from some portions of the record that plaintiff not only proceeded under a theory of discriminatory discharge, but also attempted to state a claim based upon the theory that he was subjected to sexual harassment that created a hostile work environment. The latter theory will support a claim under Title VII assuming that the plaintiff can assert and prove the elements of such a claim. See Rabidue v. Osceola Refining Co., 805 F.2d 611 (6th Cir.1986), cert. denied, 481 U.S. 1041 (1987). Plaintiff asserted in his complaint that he "was subjected to sexual harassment and intimidations by his fellow workers" because of allegations by other employees that he was homosexual. Although this could be construed as a sexual harassment claim, plaintiff represented to the magistrate in his memorandum opposing defendant's summary judgment that his complaint "does not state a claim for sexual harassment," as the factual allegations referring to sexual harassment were simply "statements to indicate disparate treatment." (App. 56). On appeal, plaintiff uses his sexual harassment allegation only as an example of disparate treatment--that CMC handled his sexual harassment complaint differently than it handled a complaint filed by a female against plaintiff. Therefore, pursuant to plaintiff's own characterization of his claim, we decline to address this sex discrimination action as one premised on a theory of sexual harassment.
 
 
 21
 Plaintiff also argued before the magistrate that "there are enough instances of disparate treatment of male homosexuals relative to similarly situated females to establish a prima facie case of sex discrimination," and "males that are homosexuals are treated differently than females in similar situations." Because it was not clear to the magistrate whether Ruth believed he was treated differently because of his sexual orientation, or because of his gender, the magistrate addressed Ruth's disparate treatment claim under both of these arguments. To the extent that Ruth alleged disparate treatment because of his homosexuality, the magistrate granted summary judgment in favor of defendant on this claim. The magistrate noted that Title VII does not prohibit discrimination based upon affectional or sexual orientation, as the statutory provision proscribing sex discrimination uses the term "sex" to refer only to membership in a class delineated by gender. See Williamson v. A.G. Edwards & Sons, Inc., 876 F.2d 69 (8th Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 1158 (1990); Ulane v. Eastern Airlines, Inc., 742 F.2d 1081 (7th Cir.1984), cert. denied, 471 U.S. 1017 (1985); Cairo v. OH Material Corp., 710 F.Supp. 1069 (M.D.La.1989). On appeal, Ruth does not challenge this portion of the magistrate's holding, and even if he did, the magistrate's correct statement of the law on this issue would require our affirmance.
 
 III.
 
 22
 The standard for determining whether summary judgment is appropriate in a particular case is set forth in Rule 56(c) of the Federal Rules of Civil Procedure.
 
 
 23
 [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.
 
 
 24
 Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) (quoting Fed.R.Civ.P. 56(c)); accord Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Potters Medical Center v. City Hosp. Ass'n, 800 F.2d 568, 572 (6th Cir.1986).
 
 
 25
 In the instant case, the magistrate found that plaintiff had failed to establish the existence of an element essential to plaintiff's claim and on which plaintiff would bear the burden of proof at trial--plaintiff had failed to make a showing sufficient to create an inference of disparate treatment because he could not establish that his employer treated differently female employees who were similarly situated. We agree with the magistrate that plaintiff could therefore not establish a prima facie case of sex discrimination and that CMC was entitled to summary judgment. We reject plaintiff's contention that the magistrate applied the wrong legal criteria to plaintiff's claim, as the law utilized by the magistrate, which is reiterated herein, is well-established.[3]
 
 
 26
 In a disparate treatment case, such as the present action, the plaintiff's ultimate burden is to persuade the court that he has been the victim of intentional discrimination. See Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 256 (1981). In the absence of direct evidence, "[p]roof of discriminatory motive ... can in some situations be inferred from the mere fact of differences in treatment." International Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n. 15 (1977).
 
 
 27
 Disparate treatment cases are subject to the following tripartite analysis:
 
 
 28
 (1) the plaintiff must establish a prima facie case of discrimination, (2) the employer must offer evidence of a legitimate, nondiscriminatory reason for its actions, and (3) the plaintiff must prove that the reason offered is in fact a pretext for intentional discrimination.
 
 
 29
 Kent County Sheriff's Ass'n v. Kent County, 826 F.2d 1485, 1492 (6th Cir.1987) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 801 (1973), and Burdine, 450 U.S. at 256-58). The plaintiff bears the burden of persuasion throughout the entire process. Canitia v. Yellow Freight Sys., Inc., 903 F.2d 1064, 1066 (6th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 516 (1990); Gagne v. Northwestern Nat'l Ins. Co., 881 F.2d 309, 313 (6th Cir.1989).
 
 
 30
 The general standard for establishing a prima facie case in disparate treatment cases under Title VII is set forth in McDonnell Douglas, 411 U.S. at 802, the seminal racial discrimination hiring case. However, as the Court noted, this standard provides an analytical framework that should be modified to accommodate different employment discrimination contexts. Id. at 802 n. 13. Accordingly, we have modified the McDonnell Douglas standard to address "reverse discrimination" claims brought by majority plaintiffs.
 
 
 31
 [A] prima facie case of "reverse discrimination" is established upon a showing that "background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority," Parker v. Baltimore and Ohio Railroad Co., 652 F.2d at 1017, see also Daye v. Harris, 655 F.2d 258 (D.C.Cir.1981); and upon a showing that the employer treated differently employees who were similarly situated but not members of the protected group. See id; see also Bundy v. Jackson, 641 F.2d 934, 951 (D.C.Cir.1981).
 
 
 32
 Murray v. Thistledown Racing Club, Inc., 770 F.2d 63, 67 (6th Cir.1985).
 
 
 33
 However articulated, the significance of the prima facie case is that it permits an "inference of discrimination ... because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978). Because the essence of a disparate treatment case is that "[t]he employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin," Teamsters, 431 U.S. at 335 n. 15, the plaintiff who seeks an inference of discriminatory motive on the basis of indirect evidence must present " 'comparative evidence demonstrating that the treatment of the plaintiff differs from that accorded to otherwise "similarly situated" individuals who are not within the plaintiff's protected group.' " Shah v. General Elec. Co., 816 F.2d 264, 268 (6th Cir.1987) (quoting B. Schlei and P. Grossman, Employment Discrimination Law 1291 (2d ed. 1983)).
 
 
 34
 Plaintiff's evidence, however, does not meet this test.[4] Plaintiff's discussions with Karen Borgert regarding rumors about plaintiff's sexual orientation are not comparable to the sexual harassment complaint filed against plaintiff, and the two incidents do not afford a basis upon which a trier of fact could find disparate treatment. Plaintiff admits that he agreed to having his concerns dealt with informally and does not dispute that he never filed a formal sexual harassment complaint regarding the rumors. In fact, plaintiff presents no evidence that he ever filed a formal sexual harassment complaint with his employer, yet, he seeks to compare CMC's response to his informal discussion with Borgert with CMC's written warning to plaintiff when a sexual harassment complaint was formally registered against him. This is not "comparative evidence" concerning "similarly situated" individuals.
 
 
 35
 Plaintiff's attempts to compare the discipline he received for his April 1987 medication error to the discipline received by the nurses administering the phenobarbital are equally unavailing.
 
 
 36
 In order for two or more employees to be considered similarly-situated for the purpose of creating an inference of disparate treatment in a Title VII case, the plaintiff must prove that all of the relevant aspects of his employment situation are "nearly identical" to those of the non-minority employees who he alleges were treated more favorably. The similarity between the compared employees must exist in all relevant aspects of their respective employment circumstances.
 
 
 37
 Payne v. Illinois Central Gulf R.R., 665 F.Supp. 1308, 1333 (W.D.Tenn.1987) (citation omitted). Plaintiff's argument that nurses and pharmacists should bear equal responsibility for medication errors belies the responsibility specifically imposed on pharmacists by Ohio law. Plaintiff simply asserts that the nurses should be considered "similarly situated," without presenting any evidence that the relevant aspects of Ruth's employment were nearly identical to those of the nurses.
 
 
 38
 Lois Fangman and Ruth were pharmacists; both committed medication errors. Ruth received a final warning for his April 1987 error, while Fangman was only counseled. However, Ruth's error differed in both type and severity of potential consequences, and the employer reasonably could consider Fangman's error less egregious than Ruth's error, which caused the administering of phenobarbital at ten times the prescribed dosage. Accordingly, plaintiff failed to establish that a female pharmacist subject to less discipline had committed an offense of the same magnitude as plaintiff's offense.
 
 
 39
 With respect to plaintiff and Diane Gary, both the duties of their positions and the magnitude of their errors differentiate them. As the director of defendant's pharmacy, Gary's responsibilities were largely managerial, and she rarely worked in plaintiff's position as a staff pharmacist. Although the relevant aspects of her duties were more similar to Ruth's at the time she was covering the second shift, the fact that her normal responsibilities extended beyond the responsibilities of a staff pharmacist means that her employment situation was not "nearly identical" to Ruth's. Ruth's failures to check the medication cart occurred regularly and concerned a regular, daily responsibility. Gary's error occurred once and concerned a responsibility that she was infrequently required to bear. Further, plaintiff presents no evidence to dispute defendant's proof that plaintiff's errors were chronic and willful. These factors render Ruth dissimilar from Gary in any sense that is relevant to this case.
 
 
 40
 Finally, even if we assume that Ruth did establish his prima facie case, the magistrate's decision to grant summary judgment was still correct on the basis that Ruth offered no proof that CMC's proffered, non-discriminatory justification was pretextual.
 
 
 41
 [I]t is clear that merely making out a prima facie case does not automatically save appellant from a summary judgment motion. Indeed, the inference of discrimination created by the prima facie case is dispelled once the employer's reason is stated, until and unless the latter is shown to be a pretext.
 
 
 42
 Gagne, 881 F.2d at 314 (internal quotation marks and citations omitted). Because CMC introduced sufficient evidence to rebut plaintiff's prima facie case of sex discrimination, Ruth assumed "the burden of persuasion ... to demonstrate that the proffered reason was not the true reason for the employment decision." Burdine, 450 U.S. at 256; Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 659 (1989).
 
 
 43
 Plaintiff has produced no evidence that could show, directly or indirectly, that defendant's proffered explanation for plaintiff's discharge is unworthy of credence. On the contrary, the record reflects that Ruth was discharged because of his willful and frequent failure to follow defendant's pharmacy procedures mandated by state law. Additionally, plaintiff offers no evidence of any animus towards males, directed towards him or towards male employees in general, that might suggest that his discharge was based upon discriminatory considerations.
 
 
 44
 In affirming the dismissal of plaintiff's Title VII claim, we are not unaware that cases involving motive or intent are normally not suited to disposition on summary judgment. Shah, 816 F.2d at 271. Nevertheless, summary judgment is available and appropriate in some Title VII cases. Id. (summary judgment appropriate when plaintiff fails to present evidence permitting a finding that other allegedly favored employees were similarly situated); Steckl v. Motorola, Inc., 703 F.2d 392, 393 (9th Cir.1983) (summary judgment appropriate where plaintiff fails to produce evidence that raises a triable issue of fact concerning pretext). In this case, plaintiff's failure to establish evidence sufficient to raise an inference of disparate treatment entitled defendant to summary judgment.
 
 
 45
 AFFIRMED.
 
 
 
 [1]
 The magistrate also granted summary judgment in favor of defendant on plaintiff's Title VII claim that CMC retaliated against plaintiff for filing charges of discrimination with the Ohio Civil Rights Commission and the Equal Employment Opportunity Commission. Further, the magistrate dismissed without prejudice plaintiff's state law cause of action for libel per se. Plaintiff does not challenge on appeal the dismissal of these claims. Consequently, they are abandoned and not reviewable. See McMurphy v. City of Flushing, 802 F.2d 191, 198-99 (6th Cir.1986)
 
 
 [2]
 In Ohio, pharmacy is regulated by chapter 4729 of the Ohio Revised Code and chapter 4729 of the Ohio Administrative Code
 (A) Only a pharmacist or pharmacy intern under the personal supervision of a pharmacist is permitted to engage in dispensing and compounding.
 (B) A person, not a pharmacist or intern under the personal supervision of a pharmacist, may assist a pharmacist in the compounding of prescriptions and dispensing of drugs in accordance with Section 4729.02 of the Revised Code and according to the following requirements:
 (1) May not engage in any procedure requiring professional judgment. The pharmacist is responsible for the drug dispensed.
 (2) The system of drug distribution must provide exact control and assign immediate responsibility only to a pharmacist accountable at every point in the system between receipt of the order for a drug and final delivery for administration or use by the patient.
 Ohio Admin.Code Sec. 4729-5-25(A), (b). " 'Personal supervision' ... means a pharmacist shall be physically present in the pharmacy and provide personal review and approval of all professional pharmaceutical activities." Ohio Admin.Code Sec. 4729-5-01(l).
 
 
 [3]
 Plaintiff urges this court to apply the analysis that is used for a claim alleging unequal pay for equal work under the Equal Pay Act. Such a claim may be established by proving that the employer "pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.' " Corning Glass Works v. Brennan, 417 U.S. 188, 195 (1974) (citing the Equal Pay Act of 1963, 29 U.S.C. 206(d)(1)). The phrase "equal work" does not require that the jobs be identical, only substantially equal in skill, effort, responsibility and working conditions. Odomes v. Nucare, Inc., 653 F.2d 246 (6th Cir.1981). Plaintiff contends that the application of this test would require a finding that he was similarly situated to employees who were treated differently. Without conceding that the application of this test would change the result in this case, we believe that the equal pay analysis, which is tailored specifically to claims of sex-based wage disparities, is unworkable in the context of discriminatory discharge claims brought under Title VII and should not be adopted for that purpose
 
 
 [4]
 Because we affirm summary judgment on the ground that none of the alleged instances of disparate treatment involve "similarly situated" individuals, we find it unnecessary to address defendant's argument that two of the alleged instances of disparate treatment--the 1986 discipline for sexual harassment and the 1987 discipline for the phenobarbital medication error--are time-barred and not extended by the continuing-violation doctrine