Tom PIERCE, Plaintiff,

v.

COMMONWEALTH LIFE INSURANCE
COMPANY and Capital Holding
Corporation, Defendants.

Civ. A. No. 92–53.

United States District Court,
E.D. Kentucky,
Covington Division.

June 25, 1993.

Katharine C. Saunders, Robert J. Hollingsworth, Cors & Bassett, Cincinnati, OH, for plaintiff.

Michael A. Luvisi, Brown, Todd & Heyburn, Louisville, KY, for defendants.

## MEMORANDUM OPINION

BERTELSMAN, Chief Judge:

Plaintiff brings this diversity action claiming reverse discrimination and intentional infliction of emotional distress, based on the circumstances surrounding his demotion by defendant. Plaintiff seeks compensatory and punitive damages.

Plaintiff Tom Pierce is represented by Katharine Saunders and Robert Hollingsworth. Defendant Commonwealth Life Insurance Co. and its parent corporation, Capital Holding Corp. are represented by Michael A. Luvisi and Donna King Perry.

### I. Factual Background

Defendant Capital Holding Corp. is a Delaware corporation whose principal place of business is located in Louisville, Kentucky. Capital owns defendant Commonwealth Insurance Company, which is a Kentucky corporation with its principal place of business in Louisville ("Commonwealth" or "defendant"). Plaintiff, Tom Pierce ("plaintiff" or "Pierce") is an Indiana citizen who has held various positions with Commonwealth since 1958.

Pierce is currently employed as an insurance representative in Commonwealth's Florence, Kentucky office. However, between April 1983 and March 1991, he held a position of higher responsibility, that of Agency Manager of the Wabash Valley Agency in Kokomo, Indiana. His demotion from that position, and the circumstances surrounding it, comprise the subject of this lawsuit.

On March 4, 1991, Deena Shaffer, then Marion Office Administrator, contacted Vice President of Human Resources Peggy Erhart ("Erhart"), and complained about Pierce's management practices and his critical evaluation of her on recent work evaluations. Shaffer also supplied Erhart with the telephone number of Debbie Kennedy, the Lafayette Office Administrator. Kennedy, said Shaffer, had similar qualms about Pierce. When Erhart contacted Kennedy, Kennedy, too, complained about Pierce's management practices and low-brow humor. Specifically, Kennedy complained about receiving a trivet from Pierce reading, "Sex is a misdemeanor. De more I miss, de meanor I get," as well a xerox copy of a cartoon valentine from Pierce inscribed, "There are many ways to say 'I love you' ... but fucking is the fastest." Kennedy also took issue with her recent performance evaluation, done by

Pierce. Erhart conveyed all of this information to Commonwealth Field Vice President John Balser.

On March 6, 1991, plaintiff was summoned to a meeting with Erhart and Balser. It was at this meeting that Balser and Erhart first informed Pierce that he had been accused of sexually harassing female employees. While Balser and Erhart were initially evasive about the precise allegations, plaintiff himself unilaterally recalled to Erhart and Balser an instance on which he had shown Kennedy a sexually oriented valentine and trivet. Plaintiff quickly added, however, that Kennedy had welcomed this conduct in good humor. Balser and Erhart instructed Pierce to meet with them on the following day.

The next day, the three met at a hotel in Kokomo, Indiana. The parties dispute what transpired at this meeting. Plaintiff alleges that Balser and Erhart again refused to specify the basis of the harassment charge, and that Balser commented that Pierce might as well have been a "murderer, rapist or child molester, that it wouldn't be any worse." Defendant denies that Balser ever said this. It is undisputed, however, that after this meeting, plaintiff was advised that he could not return to his managerial position. His personal belongings were allegedly subsequently delivered to him at a roadside Hardee's.

After at least one further meeting with Commonwealth Vice Presidents Jim Quillman and Tom Siegle, plaintiff was demoted to his present position in Florence, Kentucky. This demotion reduced plaintiff's weekly paycheck by approximately $250, and presented him with a long commute to work.

Several weeks later, plaintiff received a letter, dated May 22, 1991, authored by Laurel Fuson, Assistant General Counsel for defendants. The letter accused Pierce of having engaged in and tolerated sexual harassment at his office, despite his previous counseling as to such misconduct. This was the first time that Commonwealth had presented Pierce with a formal statement of the reasons for their actions against him.

Subsequently, in late December 1991, Balser, Erhart, and Dave Hinkle met with Kennedy at Commonwealth's Lafayette office, where they learned that Ms. Kennedy herself had engaged in the following sexually oriented comments and behavior: she gave Pierce a sexually oriented cartoon, in response to his off-color valentine; she engaged in flirtatious behavior; she commented to Pierce that if she "became horizontal and spread [her] legs, [she] might get a better evaluation;" she brought a sexually oriented "joke" apron into the office; she sent and shared sexually oriented jokes and cartoons with other employees; and she brought a pornographic video into the office. It is undisputed that Commonwealth took no disciplinary action against Kennedy for having engaged in such conduct.

Defendant has in place a company policy against sexual harassment of the nature at issue here. That policy states:

> Employees are expected to conduct themselves in accordance with Capital Holding Agency Group's equal employment opportunity policy. Acts of discrimination by supervisors or co-workers, including but not limited to, sexual, racial, or other unlawful harassment, are strictly prohibited and may result in disciplinary action up to and including termination.

## II. Legal Conclusions

### A. Reverse Sex Discrimination Claim Under Federal Law

#### 1. Governing Standards of Law

Title VII of the Civil Rights Act of 1964 provides:

> (a) It shall be an unlawful employment practice for an employer —
>
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
>
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely af-

fect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2(a).

Pierce contends that he has demonstrated a prima facie case of reverse sex discrimination under Ky.Rev.Stat.Ann. ("K.R.S.") Chapter 344.040, because he was disciplined for off-color conduct, while Kennedy, his underling, was not disciplined at all for having engaged in more pronouncedly off-color behavior. Because plaintiff has alleged no direct evidence of discrimination, the test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the seminal employment discrimination case for evaluating disparate treatment claims, applies.

■ Under the three step *McDonnell Douglas* formula, Pierce must first prove a prima facie case of discrimination against the defendant by a preponderance of the evidence. If Pierce succeeds, the burden then shifts to the defendant to show evidence of a legitimate, non-discriminatory reason for having treated him differently than Kennedy, pursuant to Commonwealth's sexual harassment policy. If defendant presents such evidence, Pierce must then demonstrate that the reasons given are merely a pretext for discriminatory acts. *See McDonnell Douglas*, 411 U.S. at 800–06, 93 S.Ct. at 1823–26; *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252–56, 101 S.Ct. 1089, 1093–95, 67 L.Ed.2d 207 (1981).

### 2. Prima Facie Case

■ In this case, plaintiff is a male seeking to demonstrate "reverse discrimination" against him by his employer, undertaken on the basis of his gender. It is settled that Title VII prohibits discrimination against all groups, including majority groups which have been historically favored. *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 279–80, 96 S.Ct. 2574, 2578–79, 49 L.Ed.2d 493 (1976). However, as one court has stated, "the presumptions in Title VII analysis that are valid when a plaintiff belongs to a disfavored group are not necessarily justified when the plaintiff is a member of an historically favored group." *Livingston v. Road-*

*way Express, Inc.*, 802 F.2d 1250, 1252 (10th Cir.1986). Therefore, "it makes little sense, within the historical context of the Act, to infer discrimination against men in the same way that discrimination is inferred against women." *Jones v. Slater Steels Corp.*, 660 F.Supp. 1570, 1575 (N.D.Ind.1987).

Courts have thus modified the prima facie case enunciated in *McDonnell Douglas* to fit the circumstances of "reverse discrimination" cases. To make a prima facie case, a plaintiff must show that "background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Jasany v. United States Postal Serv.*, 755 F.2d 1244, 1252 (6th Cir.1985) (quoting *Parker v. Baltimore & Ohio R.R. Co.*, 652 F.2d 1012, 1017 (D.C.Cir.1981)); *see also Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63, 67 (6th Cir.1985); *Ruth v. Children's Medical Ctr.*, No. 90–4069, 940 F.2d 662 (Table) (6th Cir. August 8, 1991) (available on Westlaw, 1991 WL 151158). In addition, to make his prima facie case, plaintiff must demonstrate that "the employer treated differently employees who were similarly situated but not members of the protected group." *Murray*, 770 F.2d at 67; *see also Ruth*, 940 F.2d 662 (Table), 1991 WL 151158 at 5.

■ Plaintiff here has failed to present facts from which it might be inferred that any differential treatment afforded him was due to his male gender. Most of the persons involved in the decision to demote him—Balser, Siegle, and Quillman—are also male. Moreover, there is no hint in the record that defendant engages in a regular policy of preferring male supervisors over females. Thus, Pierce has failed to support his allegation that Commonwealth is that "unusual employer" who discriminates against a historically favored group.

Moreover, plaintiff has failed to demonstrate that Commonwealth treated him differently, based on gender, than it did similarly situated employees not in the protected group (here, male persons). In an unpublished opinion, the Sixth Circuit has recognized that:

In order for two or more employees to be considered similarly-situated for the purpose of creating an inference of disparate treatment in a Title VII case, the plaintiff must prove that all of the relevant aspects of his employment situation are "nearly identical" to those of the non-minority employees who he alleges were treated more favorably. The similarity between the compared employees must exist in all relevant aspects of their respective employment circumstances.

*Ruth,* 940 F.2d 662 (Table) 1991 WL 151158 at 6.

It is undisputed that although Pierce and Kennedy were both subject to Commonwealth's policy prohibiting sexual harassment, Pierce alone was subjected to disciplinary action for having violated it. However, Pierce and Kennedy were not similarly situated. Unlike Ms. Kennedy, Pierce was a member of management, having authority over several subordinates, and responsibility for maintaining a respectful, respectable, and decorous office. Thus, defendant had reason to treat Pierce differently than his subordinates, in requiring a larger measure of sensitivity and decorum.

### 3. Defendant Has Put Forth a Legitimate, Nondiscriminatory Reason for its Actions

■ Even had Pierce established a prima facie case, defendant has nevertheless met its burden of demonstrating an undisputed, legitimate, and non-discriminatory reason for its actions. Simply put, the conduct that Pierce participated in, condoned and encouraged was a violation of Commonwealth's policy prohibiting sexual harassment.

Thus, even if Pierce had made out a prima facie case, his claim would fail, because he has not presented any inference of intentional discrimination on the defendant's part. That is, there is no reasonable indication or inference that Commonwealth's reasons for applying its policy in the manner in which it did were a pretext for discriminatory conduct.

For all of these reasons, defendant's motion for summary judgment must therefore be, and hereby is, **granted** on behalf of defendant, as to Pierce's Title VII claim of reverse discrimination.

### B. Reverse Discrimination Claim Under Kentucky Law

Under Kentucky law, it is unlawful for an employer:

(1) to fail or refuse to hire, or to discharge any individual, or otherwise to discriminate against an individual with respect to his compensation, terms, conditions or privileges of employment, because of the individual's ... sex....

K.R.S. 344.040.

■ Kentucky courts have applied the *McDonnell Douglas* framework, discussed *supra,* to discrimination cases brought under state law. *See Kentucky Center for the Arts v. Handley,* 827 S.W.2d 697, 699 (Ky.Ct.App. 1992); *White v. Rainbo Baking Co.,* 765 S.W.2d 26, 29 (Ky.Ct.App.1988). Generally, "United States Supreme Court decisions regarding the federal provisions [prohibiting employment discrimination] are most persuasive, if not controlling, in interpreting the Kentucky statute." *Kentucky Comm'n on Human Rights v. Commonwealth Dept. of Justice,* 586 S.W.2d 270, 271 (Ky.Ct.App. 1979). Because there exist no dispositive Kentucky court decisions, the court must turn to federal court decisions construing the language of Title VII, for guidance in construing the virtually identical language contained in K.R.S. 344.040. *See Harness v. Hartz Mountain Corp.,* 877 F.2d 1307, 1309 (6th Cir.1989), *cert. denied,* 493 U.S. 1024, 110 S.Ct. 728, 107 L.Ed.2d 747 (1990); *Irvin v. Airco Carbide,* 837 F.2d 724, 726 n. 1 (6th Cir.1987); *Evans v. General Tire & Rubber Co.,* 662 S.W.2d 843, 845 (Ky.Ct.App.1983); *Kentucky Comm'n on Human Rights v. Kerns Bakery, Inc.,* 644 S.W.2d 350, 352 (Ky.Ct.App.1982), *cert. denied,* 462 U.S. 1133, 103 S.Ct. 3115, 77 L.Ed.2d 1369 (1983).

Thus, the discussion, *supra,* regarding Title VII's application to cases such as this one, is highly persuasive in evaluating plaintiff's claim under K.R.S. 344.040. Like its sister federal provisions, Kentucky law holds that "while intentional discrimination may be inferred from circumstantial evidence, there

must be cold, hard facts presented from which the inference can be drawn that ... sex was a determining factor." *Handley,* 827 S.W.2d at 700 (citing *Harker v. Federal Land Bank of Louisville,* 679 S.W.2d 226 (Ky.1984). No such inference of discriminatory conduct may be drawn from the record at hand. Defendant's motion for summary judgment must therefore be, and hereby is granted, as to Pierce's claim under K.R.S. 344.040.

## C. State Law Claim for Intentional Infliction of Emotional Distress Arising from Extreme and Outrageous Conduct

By order of this court, dated June 25, 1992, Kentucky law controls Pierce's cause of action against defendant for intentional infliction of emotional distress.

### 1. Governing Standards of Law

In 1984, the Supreme Court of Kentucky recognized a cause of action for the intentional infliction of emotional distress arising from extreme and outrageous conduct. *Craft v. Rice,* 671 S.W.2d 247, 250–51 (Ky.1984). In *Craft,* the court adopted the definition of the tort of outrageous conduct set forth in the *Restatement (Second) of Torts* § 46 (1965). Section 46 provides:

§ 46. Outrageous Conduct Causing Severe Emotional Distress

(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm results to the other from it, for such bodily harm.

The Kentucky Supreme Court has subsequently set out the following elements of proof necessary to support the cause of action:

1) the wrongdoer's conduct must be intentional or reckless;

2) the conduct must be outrageous and intolerable in that it offends against the generally accepted standards of decency and morality;

3) there must be a causal connection between the wrongdoer's conduct and the emotional distress; and

4) the emotional distress must be severe. *Humana of Kentucky, Inc. v. Seitz,* 796 S.W.2d 1, 2–3 (Ky.1990).

■ To sustain summary judgment as to this issue, defendant need only demonstrate that no genuine issue of material fact exists as to any one of these four elements. In its brief, defendant focuses on the second element of the cause of action, claiming that the conduct alleged fails to rise to a level of outrageousness sufficient to support his claim.

Comment h to § 46 of the *Restatement (Second) of Torts* states:

It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so. Where reasonable men may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability.

In turn, Comment d to § 46 of the *Restatement* provides the following definition:

d. *Extreme and Outrageous Conduct.*

It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

The liability clearly does not extend to mere insults, indignities, threats, annoy-

ances, petty oppressions, or other trivialities....

Kentucky courts have explicitly adopted this definition. *See, e.g., Craft,* 671 S.W.2d at 250; *Humana,* 796 S.W.2d at 3; *Burchett v. General Tel. Co. of the South,* 699 F.Supp. 114, 117 (E.D.Ky.1988).

### 2. The Comments and Actions Directed toward Pierce by Defendant's Officers Do Not, As a Matter of Law, Constitute Outrageous Conduct

Plaintiff argues that defendant's agents accused him of and disciplined him for sexual harassment, a charge that had little basis in fact, and then permitted its officers to make quite nasty statements to him during their investigation. This, he argues, coupled with the haphazard way in which the investigation was handled, amounted to extreme and outrageous conduct.

Kentucky courts have taken a very restrictive view in delineating the type of "outrageous" conduct that will support a claim of intentional infliction of emotional distress. In one case, for instance, plaintiff was shouted at by a nurse to "shut up," lest she disturb the other patients, while delivering her stillborn child, unassisted, into a bedpan. *Humana,* 796 S.W.2d at 3. Later, another nurse told plaintiff, in response to her inquiries as to what was to become of the stillborn fetus, "Honey, we dispose of them right here at the hospital." *Id.* Nonetheless, the court held that the plaintiff had failed to meet the threshold requirement of outrageousness under Kentucky law. *Id.* at 4. Similarly, in *Whittington v. Whittington,* 766 S.W.2d 73 (Ky.App.1989), the court held that a husband who had committed adultery, spent the proceeds of checks and other assets during divorce proceedings, and then threatened his wife in order to achieve a favorable settlement, had not engaged in "outrageous" conduct under Kentucky law.

The same stringency applies in the employment context. For instance, in *Zurich Ins. Co. v. Mitchell,* 712 S.W.2d 340, 344 (Ky.1986), the Kentucky Supreme Court held that a worker's compensation insurer's refusal to make timely payments of benefits did not support an action for outrageous conduct.

And, in *Burchett,* 699 F.Supp. at 117, the court held that an employer's policy of prohibiting former employees from working on the employer's property did not constitute outrageous conduct under Kentucky law.

In this case, Balser stated to Pierce on one occasion that he (Pierce) might as well have been a "murderer, rapist or child molester, that it wouldn't be any worse." On another occasion, Balser told Pierce that, "if Debbie had pulled her pants down and you would have looked, you were just as guilty...."

On the very next day, eight years worth of Pierce's personal belongings were delivered to him at a roadside Hardee's. After Pierce was demoted within the company, with a pay decrease, he received a formal statement from Commonwealth accusing Pierce of having engaged in and tolerated sexual harassment at the offices in his charge.

None of this conduct rises to the extraordinary standard required by the Kentucky tort of intentional infliction of emotional distress. As to the insulting statements directed towards plaintiff by Balser and Siegle, they fall, at worst, within the category of "mere insults, indignities, threats, annoyances, [or] petty oppressions ..." to which "liability [for outrageous conduct] clearly does not extend." *See Restatement (Second) of Torts* § 46, cmt. d.

Further, defendant's officers acted within their rights in their alleged refusals to inform plaintiff of the specific nature of the allegations against him, to consider Pierce's offers of evidence of Kennedy's conduct, and to provide him with a private hearing. The court notes that Kentucky, with limited exceptions, continues to adhere to the "terminable at will" employment doctrine. *See Firestone Textile Co. v. Meadows,* 666 S.W.2d 730, 731 (Ky.1984); *Nork v. Fetter Printing Co.,* 738 S.W.2d 824, 826–27 (1987). Under Kentucky law, Pierce, as an at will employee, could have been legally discharged or demoted at any time, for any reason or for no reason at all. *See Gryzb v. Evans,* 700 S.W.2d 399, 401 (Ky.1985). Defendant's failure to fully document its reasons for demoting plaintiff, and its apparently hasty action against him, may have been rude or callous,

but, as the above analysis indicates, these actions fall far short of the type of extreme and outrageous behavior contemplated by the Restatement and the Kentucky courts.

Therefore, defendant's motion for summary judgment as to plaintiff's claim of intentional infliction of emotional distress must be, and hereby is, **granted.**

**IT IS SO ORDERED.**